1
2
3
4
5
6
7
8
9                        UNITED STATES DISTRICT COURT

10                    FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12   RYANN LYNN JONES,                        Case No.  1:18-cv-01606-DAD-JDP

13                    Petitioner,             FINDINGS AND RECOMMENDATIONS
                                              TO DENY THE PETITION FOR A WRIT OF
14        v.                                  HABEAS CORPUS AND TO DECLINE TO
                                              ISSUE A CERTIFICATE OF
15   DEAN BORDERS,                            APPEALABILITY

16                    Respondent.             OBJECTIONS DUE WITHIN THIRTY DAYS

17                                            ECF No. 1

18

19          Petitioner Ryann Lynn Jones, a state prisoner with counsel, seeks a writ of habeas corpus

20   under 28 U.S.C. § 2254.  ECF No. 1.  He offers four grounds for why habeas relief is warranted:

21   first, that the California Court of Appeal made factual and legal errors that deprived him of an

22   "adequate and effective" appeal in violation of the Fourteenth and Sixth Amendment, *see id*. at

23   34; second, that the trial court violated due process by erroneously admitting evidence that used

24   suggestive and unreliable identification procedures, *see id*. at 43; third, that the prosecution

25   committed misconduct by appealing to juror emotion, resulting in a fundamentally unfair trial, *see*

26   *id*. at 48; and fourth, that cumulative errors created a fundamentally unfair trial, *id*. at 51.  The

27   California Court of Appeal rejected the last three claims in a reasoned opinion; all four claims

28

                                              1

were then rejected without comment by the California Supreme Court.[1]  *See* ECF Nos. 14-57, 14-59, 14-60.  For the reasons outlined below, we recommend that the court deny the petition and decline to issue a certificate of appealability.

## I.  Background

We set forth below the facts of the underlying offenses, as summarized by the California Court of Appeal.  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

### Report of Child in Respiratory Arrest

On Sunday March 22, 2009, at 5:41 p.m., Detective Jared Hughes of the Visalia police department was dispatched to investigate a report of a nonbreathing child who was three and a half years old.  Hughes arrived at the location two minutes later and saw defendant running outside, holding a child in his arms.  Sergeant Randy Lentzner arrived at about the same time.  Defendant followed Hughes's instruction to place the child down on the grass.  Hughes found Natalynn's skin cool to the touch and she was pale white.  Natalynn had no pulse, was soaking wet, and lifeless.  Hughes made sure Natalynn's throat was clear and tilted her head back.  Lentzner placed a breathing mask over Natalynn's face and gave her the first rescue breath.  Hughes saw Natalynn's chest rising.  They achieved a faint pulse and did not perform any chest compressions.  Paramedics arrived within two minutes and took over Natalynn's care.

Hughes briefly spoke to defendant and viewed the apartment.  Hughes then followed Natalynn to the hospital.  Most of her clothing had been removed.  Hughes saw bruising on her chest, forehead, behind her ears, right shoulder, back, wrists, knee, inner thigh, and left nostril.  After Natalynn was pronounced deceased, Hughes took photographs to document her injuries.  The photographs were received into evidence.

Ryan Morgan was an EMT (emergency medical technician) paramedic dispatched to the emergency call along with his partner, EMT David Rodgers.  Morgan determined Natalynn was not breathing and had no pulse; the cardiac monitor showed she was asystole, meaning she was dead.  He and Rodgers administered life support by providing one hundred percent oxygen and performing compressions on Natalynn's chest.  Natalynn was soaking wet from head to toe.  It seemed strange she was so wet and still in her clothes.  Morgan and Rodgers testified they had seen the officers performing chest compressions.  Rodgers recalled Natalynn's

---

[1] We agree with petitioner that respondent has not challenged the first claim—that the California Court of Appeal made factual and legal errors that deprived petitioner of an adequate appeal—on exhaustion grounds.  *See* ECF No. 18 at 7.

airway was blocked, so he performed back blows to dislodge the blockage and performed hand CPR.

Morgan asked what happened. Defendant said Natalynn had been in her room and she had eaten pizza. Defendant then mentioned something about the bathroom and the tub. Morgan could not definitely remember who told him this information.

It took Natalynn four minutes to arrive to the hospital by ambulance. Natalynn arrived at the hospital intubated with a tube going into her lungs. Dr. Kealani Sine, a pediatric hospitalist, attended Natalynn at the hospital with the emergency room physician; she had no heart rate and was dead. Dr. Sine was suspicious that Natalynn's bruising was not caused by accidental trauma. Although she was already dead, Dr. Sine ordered a full body scan of Natalynn. Dr. Sine did not have the results of the scan. In Natalynn's condition, there was no chance emergency room doctors and nurses could revive her, but due to her young age they tried to do so for 15 minutes.

**Police Investigation**

Hughes spoke briefly to defendant, who appeared to have been crying and was pacing back and forth. Hughes briefly went to Natalynn's apartment while Natalynn was being attended to. Another officer walked defendant over to the apartment. Hughes asked defendant what happened. Defendant's initial response was he did not know. Defendant explained he was dating Natalynn's mother, Nicole Lee. Defendant told Hughes he did not live in the apartment and did not know the address. Hughes walked briefly into Natalynn's apartment. Natalynn's room was messy. A lower dresser drawer was pulled out and toys were scattered about.

Defendant did not know if Natalynn had been choking on something but she had been eating pizza 20 minutes earlier and was fine. Hughes followed the ambulance to the hospital and stayed with Natalynn. At the hospital, Hughes talked to Troy Miller, Natalynn's father. Miller was inconsolable. Miller was crying and made several statements that Natalynn was killed.
At the hospital, Hughes contacted Natalynn's mother, Nicole Lee, after Natalynn died. Lee was upset. Defendant arrived at the hospital thereafter. Lee had defendant view Natalynn with her and account for some of Natalynn's bruises. Upon seeing Natalynn's body, Lee broke down and immediately pointed to a bruise on Natalynn's right temple. Lee asked defendant, "'What's this?'" Lee asked defendant about a line across Natalynn's forehead. In response, defendant turned to a nurse and asked if they had received scan reports of Natalynn's body.

Lentzner also went into Natalynn's apartment. Another officer was with defendant in the apartment. Lentzner briefly went into Natalynn's room and the bathroom. There was residual water in the bathtub, which appeared to have been recently drained. Lentzner took photographs of the apartment. What looked like blood, vomit, and hair was on the kitchen counter next to the sink where

3

defendant tried to revive Natalynn.  No human tissue, blood, or hair was collected from the apartment.  No holes were found in the walls of the apartment.  Photographs of the scene were admitted into evidence and shown to the jury.

Chris Moore lived in the apartment above Lee.  Moore woke up late on Sunday, March 22 with a hangover.  Moore was functioning fine and called for a pizza.  Moore heard a loud rumbling noise for about 15 minutes from the apartment below and believed it came from a video game.  He had not heard the noise before.  At some point the noise stopped.

Later, Moore heard a loud thumping noise on the wall at least six times.  It was not like a noise caused by hammering.  The noise was sequential and happened very quickly.  Moore described it as, "boom, boom, boom, boom, boom, boom."  Moore then heard a voice saying, "'Come on, baby, wake up, baby.'"  The noise was coming from directly beneath Moore.  Moore did not know the people and did not go downstairs.  Moore described himself as startled and shocked.

Linda Cavazos was also one of Lee's neighbors.  Cavazos did not remember hearing anything loud or unusual on March 22, 2009, but said she kept her television on loud.  She did remember hearing a bunch of sirens that day.

**Defendant's Statements to Investigators**

Detective Osvaldo Dominguez questioned defendant twice and recorded these sessions.  The first time was the day Natalynn died inside her apartment.  The audio recording of the questioning was played for the jury.  Defendant told Dominguez he and Natalynn were in the apartment alone.  Natalynn had been running around, doing crafts, and running back into her room.  Defendant said he heard a noise.  When defendant went into Natalynn's room to check on her, she was lying limp on the ground with her eyes rolled back.  Defendant took Natalynn to the sink, splashed water on her face, and pushed on her stomach.  Natalynn began to vomit.  Defendant performed CPR.  Defendant panicked because Natalynn turned blue, so he called 911.  When asked if anything like this happened before, defendant said one time when Natalynn was spinning around she got dizzy and fell, hitting her head on a safe in the closet.

On March 25, 2009, Dominguez again questioned and recorded defendant about the circumstances leading to Natalynn's death.  The recording of the questioning session was played for the jury.  Defendant told Dominguez that on the morning Natalynn died, defendant went with her and Lee to a swap meet and had lunch with his mother.  They returned to their apartment about 1:15 p.m.  Natalynn and her mother played and made crafts until Lee left for work between 4:35 and 4:40 p.m.  Defendant was alone with Natalynn.

Defendant explained Natalynn became upset because her mother

4

was leaving.  Natalynn was crying, running toward the door to catch her mother, and "threw a fit."  Defendant told Natalynn to stop her tantrum or he would give her a spanking.  Defendant swatted Natalynn on the behind twice; she calmed down and started watching television.

According to defendant, Natalynn began to run around the kitchen island, switching directions.  Natalynn cut one turn too close and banged her head on the wall.  Natalynn looked at defendant and asked him to come over to her.  Defendant kissed Natalynn's head.  She whimpered a little and then kept running around.  Defendant went back to his recliner and could hear Natalynn playing with her toys.

Defendant had been playing the video game "Resident Evil 5."  Defendant did not worry about Natalynn being alone in her room because she was not very adventuresome.  As he was sitting in the living room, he heard a thud like Natalynn had jumped off her bed.  It was a real solid sound.  Defendant waited for Natalynn to cry.  He waited a few seconds, heard nothing, and got up from his chair.  Defendant said he found Natalynn up against the dresser.  He thought she had fallen asleep.  Defendant bent over and spoke to Natalynn, but she did not respond.  Defendant thought Natalynn was unconscious.  He brought her to the kitchen, splashed water on her, and noticed her mouth was open and her face was clenched.

Defendant pushed on Natalynn's stomach, which appeared bloated.  Natalynn was not breathing.  Defendant administered CPR and called 911.  Defendant also said that days earlier he told Natalynn to get her socks from her dresser.  When defendant entered her room, Natalynn was standing on her bed to reach into her dresser.  She was startled and fell from the bed, again hitting her head.

Defendant told investigators it was okay to spank a child and he had done so to Natalynn about five times.  Defendant knew no one who would want to abuse Natalynn and described Lee as being easy on her.  Defendant thought the bruises on Natalynn were from the time she fell off her bed and the lesion on her nostril was from putting a freshwater clam shell up her nose.  Defendant described Natalynn as accident prone.  Dominguez showed defendant Natalynn's autopsy photographs depicting extensive bruising and told him Natalynn had massive bleeding between the scalp and her skull, bleeding in her brain, and bleeding in her stomach.  When Dominguez asked defendant how this could have happened, defendant had no explanation.

Defendant insisted he would never do anything to hurt Natalynn and did everything he could to save her life.  When it was pointed out defendant was with Natalynn and she had "hellacious bruises" that needed to be explained, defendant admitted there were "more bruises than her just bumping her head."  Defendant conceded the bruises were "not from her doing" and had "to be from somewhere else."

Defendant was arrested on March 25, 2009, after he was questioned

by police.

**Autopsy**

Dr. Burr Hartman was the forensic pathologist who conducted Natalynn's autopsy on March 24, 2009.  Natalynn was 37 inches tall and weighed 30 pounds.  During his external examination of Natalynn, Dr. Hartman observed many bruises and contusions on Natalynn's body.  There were bruises and injuries to Natalynn's abdomen, chest, back, and head.  After examining and photographing Natalynn's body, Dr. Hartman examined her internally.

Dr. Hartman found bruising along the midline of a portion of Natalynn's mesentery of the small colon, the transverse colon, and the sigmoid colon near the spine.  Dr. Hartman described this as abdominal trauma caused by a blow to the abdomen.  Abdominal injuries to children do not occur from CPR because the procedure is performed on the chest and mouth and the compressions used in CPR are too gentle to injure anything.  Dr. Hartman described Natalynn's abdominal injuries as acute because there was fresh bleeding from them.  It would be "very unusual" for a child Natalynn's age to have self-inflicted her abdominal injuries.

When he examined Natalynn's skull, Dr. Hartman did not find skull fractures, but he found bleeding under the skull beneath the dura mater covering the surface of the brain.  Dr. Hartman explained it would be exceptional for Natalynn to have caused these injuries unless she had some sort of mental illness.  Dr. Hartman described the photographs he had taken of Natalynn's body depicting the bruises and injuries.  The photographs were admitted into evidence.

Dr. Hartman explained a person has to be alive to form a bruise.  In Dr. Hartman's opinion, Natalynn's injuries were all acute, in close proximity to each other, and explained her death.  Dr. Hartman concluded Natalynn died from multiple blunt force trauma to the head, abdomen, and chest.  Although Dr. Hartman found no injury to Natalynn's heart, he explained a sharp blow to the chest can cause commotio cordis—the stopping of the heart without showing an anatomic injury.  Natalynn's injuries occurred in close succession to one another.

**Medical Expert Opinions**

Dr. Frederic Bruhn, a board-certified pediatrician, testified as an expert on physical child abuse.  After reviewing all of Natalynn's medical records, Dr. Bruhn concluded Natalynn died from multiple blunt force trauma resulting from a nonaccidental homicide.  Dr. Bruhn further explained it was not likely Natalynn would have suffered subdural hematomas from falling off her dresser next to her bed or from falling off her bed.

Dr. Joseph Cohen is a forensic pathologist who contracts to perform autopsies in Marin and Napa Counties.  Dr. Cohen had conducted over 6,000 autopsies, hundreds of which were performed on

children.  Dr. Cohen reviewed Natalynn's medical reports, reports of the paramedics, fire department reports, and preliminary hearing testimony from defendant's case.  Dr. Cohen concluded Natalynn's head injuries would have caused death in minutes, not hours.  Dr. Cohen also concluded Natalynn was already dead when paramedics and firefighters began to attend her.

Given the "package" of multiple bruises over Natalynn's body, Dr. Cohen did not believe her injuries were self-inflicted or accidental.  There could be some bruising from administration of CPR, but not to the extent of Natalynn's bruising and not when CPR is conducted on someone already dead.  Most of Natalynn's internal injuries could not have been caused by CPR, even if it was improperly performed.  One exception was bruising to her hilum behind the liver.  A small intestine injury would not occur during CPR on a dead person.  People frequently vomit during CPR or in the process of dying, which would explain the presence of vomit in the lungs.

Although Dr. Cohen did not find Dr. Hartman's autopsy report was perfect, the fact he did not take and study tissue samples from Natalynn was immaterial to understanding how Natalynn died.  While the injuries to Natalynn's abdomen were acute, she could have survived those injuries.  According to Dr. Cohen, Natalynn died from multiple blunt impact injuries to her head.  Dr. Cohen believed Natalynn's neurological deterioration was immediate after she was injured and she did not die from choking.

The defense called Max Jehle, an agricultural biologist and pest management specialist.  Jehle explained there is a species of freshwater mussel in California creeks and water sheds, including the Kaweah Reservoir.  The species is found in Mill Creek in Tulare County.  The mussels can pick up bacteria in the water from animal feces.  Among the pathogens found in water sources is E. coli.  Even in dry conditions, biofilms of bacteria can remain on the shells.  On cross-examination, Jehle said he had never personally tested clam shells.

Defendant called Dr. Harry Bonnell, a board-certified pathologist, who also reviewed Natalynn's relevant medical records.  Dr. Bonnell also reviewed the testimony of Dr. Bruhn.  Dr. Bonnell explained that not all subdural hematomas are lethal.

Dr. Bonnell disagreed with the other doctors that Natalynn died from blunt force trauma.  Dr. Bonnell believed Natalynn died from choking and asphyxiation.  Further, in Dr. Bonnell's opinion, Natalynn's subdural hematomas were too small to cause death.  Dr. Bonnell stated the bruising on Natalynn's chest could have been caused by chest compressions given to her during CPR.  Dr. Bonnell cited recent forensic studies of injuries misinterpreted as being caused by third parties but were the result of CPR.  Dr. Bonnell believed many of Natalynn's injuries could be explained by the CPR she received, including injuries and bruising to her upper chest, abdominal bleeding, and injuries to the chin, back, and mouth.

Defendant called David Satterlee, a flight paramedic and expert on resuscitation.  Satterlee explained that back blows like the ones the paramedics gave Natalynn were inappropriate in a child older than one year.  Additionally, reaching into a patient's mouth to dislodge food or other obstructions is also problematic because it can push the obstruction deeper.  Satterlee thought Natalynn's bruising on her back, chin, and chest were consistent with CPR.  Satterlee could not rule out the infliction of trauma on Natalynn as the cause of her bruises and injuries.

**Prior Injuries to Natalynn**

Troy Miller, Natalynn's father, testified he was in a relationship with Nicole Lee for six years and Natalynn was born to them in June 2005.  Miller and Lee separated in 2007 when Natalynn was about two years old.  Lee had custody of Natalynn and initially lived with their mutual friend, Jessica Rosales.  Miller had Natalynn every other weekend and every other Tuesday and Wednesday.  Miller eventually rented a house in Tulare about a mile from the McDonald's restaurant discussed later.

Miller described Natalynn as a playful, happy, polite, and well-mannered child.  Natalynn was healthy.  Natalynn took no medications, she was not accident prone, she was active, and she played well with other children.  Natalynn was also respectful of adults.  Miller described Natalynn as being coordinated.  She liked to climb up the ladder on her bunkbed.  Natalynn was not a risk taker and was not hyperactive.  Miller described her as calm and truthful.

Lee started dating Andrew Rose.  Natalynn liked Rose and would always talk about him.  Miller told Lee that if she was going to date, it would be better if she did not bring Natalynn over to the date's home unless it was a serious, long-term relationship.  Miller offered to take Natalynn, and she came over to Miller's home sometimes when Lee was dating Rose.  Natalynn was always happy to see her mother when Lee picked her up from Miller's home.

Sometime during August 2008, Miller learned Lee was dating defendant, whom Natalynn called "Ry-ry."  Miller was concerned Lee was taking Natalynn to sleep over at defendant's house.  When Lee's relationship with defendant started, Miller did not notice anything different or unusual in Natalynn's demeanor.

Between September and October, however, Miller started noticing injuries on Natalynn, including bruising on her chest and abrasions on her side.  On one occasion, Natalynn attributed an abrasion and scratch to falling off her bike.  On another, she said defendant had punched her, and she demonstrated a punching motion.  There was another time when Natalynn demonstrated to Miller how defendant had grabbed her and thrown her into what Natalynn described as a "safety sink."  Miller later learned the safety sink was actually a metal safe.

Miller noticed the bruises when he bathed Natalynn.  In October

2008, Miller also noticed Natalynn had a bowel movement in her pants, which he found strange because she was potty trained. While cleaning Natalynn, he noticed marks inconsistent with a rash. Miller asked Natalynn if someone had spanked her and Natalynn got quiet, would not answer Miller, and became teary eyed. Shown a photograph depicting two bruises on Natalynn's chest, Miller explained they were knuckle sized. When asked how she got these bruises, a teary-eyed Natalynn said defendant was fighting with her.

Miller told Lee during a telephone conversation that Natalynn informed him defendant was fighting with her and asked Lee what was going on. Lee told Miller they were just play fighting. Miller told Lee he was not cool with an adult who could not control his strength when playing with his three-year-old daughter. Lee told Miller to "F off" and to mind his own business.

Miller was shown a diagram depicting Natalynn in December 2008, with a strawberry scrape mark and abrasion on her right side. Natalynn told Miller she had fallen off a bike when she was with defendant. Natalynn said defendant was watching her. Miller confronted Lee and told her not to leave Natalynn alone with defendant. One time Natalynn was in pain when Miller picked her up. The jury was shown a diagram depicting Natalynn's injuries. This was the incident when Natalynn was thrown into a safe. Lee had told Miller Natalynn was spinning around and fell into a box. Natalynn was upset and trembling as she related what happened. She told Miller she was afraid of defendant.

Natalynn asked Miller to tell Lee she did not want to be around defendant anymore. When Miller asked Natalynn why, she replied defendant hurts her. Miller told Natalynn they would both talk to Lee. Natalynn told Miller she could not talk to her mother and Miller had to do it for her. Natalynn told Miller she wanted to live with him, not with her mother. Miller talked to Lee with Natalynn present. Later, Miller called Lee on the telephone. Miller gave Lee a second warning that if this ever happened again, Miller would "find that mother fucker and . . . kill him." Lee promised never to let Natalynn around defendant again. Natalynn was elated when Miller told her about her mother's promise not to let defendant watch her again.

Miller was shown another diagram depicting a bruise on Natalynn's head after she supposedly ran into sliding door. For a period of time, Natalynn was very happy during February 2009 and did not speak about defendant anymore. Miller never contacted the police or CPS. In March 2009, Miller understood Lee and Natalynn were moving into an apartment. Natalynn never told Miller that Lee, who had apparently broken up with defendant, had gotten back together with him. Miller was unaware Lee, Natalynn, and defendant were living together in the apartment in March of 2009.

Earlier in March 2009, Miller saw a large bruise on Natalynn, depicted in a diagram at trial. The bruising subsided, but was still visible on Natalynn on March 18, 2009. Natalynn told Miller she was with defendant when the injury happened. Natalynn was

9

constantly crying and upset during this time when he questioned her.  Natalynn stayed with Miller on March 18 and he was still unaware defendant was living with Lee.  Natalynn was very happy during her stay with Miller, but her demeanor totally changed when her mother was about to pick her up.  She began crying.  Lee decided to let Natalynn stay with Miller that evening.

The same evening, Miller bathed Natalynn and saw no new bruises on her.  Miller got Natalynn ready for school the next morning and Lee picked her up.  Miller had to carry Natalynn out because she did not want to go.  Natalynn just sat in the car crying.  She did not look up at Miller.  Miller told Natalynn not to be upset because it was Thursday, and on Friday Natalynn would be staying with him.  Miller expected to see Natalynn that weekend.  Instead, he received a call from Lee's mother telling him Natalynn had choked on a piece of pizza, died, and was at the hospital.  Miller found Natalynn with her nose smashed sideways on her face and so many bruises on her head and chest he could not count them all.

Ernesto Rosales (Ernesto), Jessica Rosales's brother, said Natalynn was a lovable little girl, and his sister would often take care of her.  Ernesto had moved to Texas but was visiting his sister in 2008 and went out with Lee and defendant to a bar.  Defendant talked to Ernesto about Lee being his girlfriend and said Natalynn was a cute little girl, but "he had no use for her around him." Ernesto thought defendant was drunk when he made these comments.

Jessica Rosales knew Troy Miller before she knew Lee, but Rosales considered Lee to be her best friend.  After Lee was having problems with Miller, she and Natalynn moved in with Rosales.  Miller briefly moved in with Rosales and Lee, but the situation did not work out.  Rosales sided with Lee and was in an argument with Miller.  Rosales and Lee were both working.  Rosales helped Lee with babysitting and would pick up Natalynn from preschool.  Rosales would watch Natalynn every day while Lee was at work and on weekends if Lee was working.  Rosales acted like Natalynn's mother and actually spent more time with her than Lee.

Rosales described Natalynn as a well-mannered, respectful, and truthful child.  Natalynn was healthy until her death and did not require any special medication.  Natalynn was not accident prone and did not take risks.  Prior to Lee dating defendant, Rosales did not see injuries or bruising on Natalynn except on one occasion when she fell off her tricycle and hurt her knee.  Natalynn had a positive relationship with Andrew Rose while Lee dated him.  Rosales never saw Natalynn injured during the time she was around Rose.

Lee began to date defendant in August 2008.  Natalynn interacted well with defendant when he first started dating Lee.  At some point, Lee would spend the night with defendant, who lived with his parents.  Natalynn would either stay with Rosales or with Lee.  During October and November 2008, Natalynn seemed scared about going to defendant's house.  Natalynn asked to stay with Rosales all the time.  During this time period, Rosales also began to

10

notice injuries on Natalynn that would always occur when Natalynn was with defendant.  Defendant would watch Natalynn when Rosales was unavailable.

Rosales saw a bruise on Natalynn's left cheek in December 2008. Rosales asked Natalynn how she was injured but Natalynn said she could not remember and looked down at the ground.  Rosales also saw a bruise on Natalynn's right cheek, along with a cut on the cheek and a cut, swollen lip on December 29, 2008.  The lip was cut on the inside.  When Rosales asked Natalynn what happened, Natalynn replied she could not say "because mommie would get mad." Rosales persisted and Natalynn told Rosales and two of Rosales's friends that defendant did it.  Rosales took a photograph of this injury.  This photograph was admitted into evidence and shown to the jury.  Rosales did not take the photograph because of the injury, but because she liked taking pictures of Natalynn.

Diagrams were admitted depicting burns on Natalynn's ears and a bruise on her right shoulder that Rosales saw on February 26, 2009. Rosales took Natalynn to a clinic to be examined by her friend Beatrice Manriquez.  Natalynn did not tell Rosales how she received these injuries.  Natalynn was always happy staying with Rosales for the night, but did not want to go to defendant's house. Beatrice Manriquez confirmed she examined Natalynn at the clinic and corroborated Rosales's account of Natalynn's injuries.

The first week in March 2009, Lee and Natalynn moved out of Rosales's home and into their own apartment.  Rosales later learned defendant was living with Lee and Natalynn.  On March 7, 2009, Lee was to bring Natalynn to Rosales's home.  Before bringing Natalynn over, Lee called to explain Natalynn had had an accident. When defendant brought Natalynn, Rosales saw a large knot on her head.  Rosales photographed the injury, which was admitted into evidence and shown to the jury.  Rosales described the knot as the size of a small apple.  Natalynn acted lethargic and tired.  Rosales asked defendant what happened.  Defendant said when Natalynn was reaching into a drawer to get socks, he entered her room and said boo; Natalynn fell and hit her head.  On Lee's instructions, Rosales woke Natalynn from her sleep every 20 or 30 minutes.  Lee told Rosales not to take Natalynn to the emergency room.

Rosales saw Natalynn two or three times after that.  The last time Rosales saw Natalynn was on March 20, 2009.  The prior injury was still on Natalynn's forehead, but she had no new injuries. Natalynn acted like a normal three-year-old.  Rosales took Natalynn to a friend's house to watch a movie.  Defendant made an angry call to Rosales asking where "the fuck" she was because he was waiting outside Rosales's house to pick up Natalynn.  Rosales got angry at defendant and hung up on him.  She and her friend brought Natalynn back to her home.

Defendant was next to his vehicle, yelling.  Lee was looking down. Defendant yelled that Natalynn was not her daughter and questioned why Rosales took so long.  Rosales tried to have Natalynn stay with her that evening.  Rosales handed Natalynn over

to Lee and asked her why she let defendant talk that way.  Lee took
Natalynn.  March 20, 2009, was the last time Rosales saw Natalynn.

Natalynn's preschool teacher did not see Natalynn injured at
school.  The teacher did see a substantial knot on Natalynn's
forehead prior to her death.  Joclyn Paez had a small daycare and
started watching Natalynn when she was between a year-and-a-half
and two years old.  Natalynn was sometimes picked up by Miller,
Rosales, or Lee.  Natalynn never got hurt while at the daycare and
was not accident prone.  Natalynn was healthy, played well with the
other children, and was not a climber.  Natalynn's demeanor was
always excited when her father picked her up but not excited when
Rosales picked her up.  One time Natalynn "threw a fit" when
Rosales picked her up.  Andrew Rose would also pick up Natalynn.
Natalynn liked Rose a lot.

Lee enrolled Natalynn into preschool.  In February 2009, Lee had
Paez babysit Natalynn again two days a week.  When Paez cared
for Natalynn the second time, her behavior was changed and she
was quiet and timid.  Natalynn would have no reaction when Lee
picked her up.  Paez never watched Natalynn after March 5, 2009.

**Incidents at McDonald's**

Three witnesses saw defendant berate Natalynn at McDonald's on
two occasions when her mother was also there.  Two witnesses
reported the incidents to investigators within weeks of Natalynn's
death.  One witness had seen pictures of Natalynn and defendant in
news stories before telling investigators.  One of the workers at
McDonald's recognized Natalynn and defendant from video images
taken by the restaurant.

Frank Arnold investigated Natalynn's death for the district
attorney's office.  Arnold questioned Tracy Dysart Griffin, Debra
Bentz, and Sabina Cardenas about incidents that had occurred at the
McDonald's at Cross and J Streets in Tulare involving defendant,
Lee, and Natalynn.  The three witnesses were shown Department of
Motor Vehicle photographs of Lee and defendant and a family
photograph of Natalynn.  Arnold explained he used these three
photographs because they were the highest quality pictures he
obtained.

Because he was not investigating a crime at the McDonald's itself,
Arnold did not use a six-pack photographic lineup with the subject
as one of the six people in the lineup.  None of the witnesses gave
Arnold a prior physical description of defendant.  Arnold prepared a
standard photographic array that included other pictures as well as
defendant's picture, but did not use it.

Sabina Cardenas was questioned by Arnold a year after Natalynn's
death.  She worked at the McDonald's on J Street in February 2009
between 6:00 a.m. and 1:00 p.m. on weekdays.  One midmorning,
Cardenas was at her register when she heard a little girl crying.  The
little girl was sitting at a booth with a man shouting at her.  There
was also a young lady at the table.  The man yelled at the little girl

three or four times to "'Shut the fuck up.'" The young woman was just sitting there. Cardenas was close enough to view all three people, including the man.

Cardenas began cleaning an area near the booth the trio were sitting at. Defendant pounded the table with his fists. Cardenas identified Natalynn from a photograph. She identified defendant in court as the man yelling at Natalynn. Cardenas remembered what they looked like but did not see Lee as clearly because she had her head down. Cardenas would not look out into the gallery to identify Lee, who was apparently observing the trial. Cardenas reported the incident to her manager.

On April 2, 2009, Debra Bentz talked to Arnold about an incident she witnessed at the McDonald's on J Street in February 2009. Bentz was dining in a booth with three of her grandchildren one weeknight evening. The grandchildren were between 10 and 13 years old. A little girl was sitting in a high chair with a man and a woman. Bentz and the man were facing one another. Bentz had not seen these people before. Bentz made eye contact with the little girl and they smiled at each other.

While Bentz was sitting at the booth, the man suddenly raised his left arm and came down to strike the girl's temple with his fist clenched. He stopped his swing right before he would have hit the girl. The man had a grimaced look for several seconds. Bentz was frightened and thought the child's life was in danger and almost jumped up out of her seat. The man told the girl, "'You might get away with that with them, but you won't get away with that with me.'" The girl looked at Bentz, put her head down, and looked frightened. As the man spoke, he left his fist next to the girl's head. The man appeared as though he was trying to get a grip over himself. Bentz described the man's demeanor as angry. The woman in the booth did not say or do anything.

Bentz got a good look at the man and the little girl. Later, Bentz saw a picture on the news of the man and of a little girl who had been killed; she also saw pictures in a newspaper article. They were the same people Bentz had seen in the restaurant. Bentz identified Natalynn as the girl she saw in McDonald's by her photograph and identified defendant in court as the man who threatened Natalynn. Bentz did not see Lee's face directly because Lee was sitting with her back to Bentz. Bentz saw a side view of Lee when Lee left the restaurant. Bentz did recognize Lee from her picture. Bentz was never shown photographic lineups with a display of six women. Arnold did not name Lee, defendant, or Natalynn when he showed Bentz individual photographs of them.

Bentz particularly recalled defendant's eyes and the grimace on his face as he threatened Natalynn. Bentz was contacted twice by Arnold, most recently in 2013. Arnold did show Bentz photographs of different males and Bentz identified defendant. Although she was not positive, Bentz thought she was with her grandchildren on a Thursday or Friday evening because her husband works those evenings and he was not with them. Bentz did not need a

photograph of defendant in order to identify him.

Tracy Griffin (formerly Dysart) talked to Arnold on April 1, 2009. She started working at the J Street McDonald's in July 2008 and stopped working there at the end of April 2009.  In February 2009, Griffin worked from 7:00 a.m. to 3:00 p.m.  between four and five days a week but she did not work weekends.  In February or March of 2009, after 10:30 a.m., Griffin was working the front counter when she saw a little girl playing with her food and wanting her toy.  A man at the table did not want the girl to play with the food and the toy, he wanted her to sit down.  When the girl did not comply, the man reached across the table, grabbed her by the left arm, and pulled her down to sit.  The girl fell to her knees in the process.  Griffin had seen the man in the restaurant several times, but only remembered the one incident.

Griffin got a fairly good look at the people at the table and could see the girl's face; the little girl looked scared.  Griffin reported the incident to her manager.  Arnold showed Griffin photographs. Griffin identified Natalynn from the girl in the photograph Arnold showed her and identified defendant in court as the man she saw with Natalynn at McDonald's.  She got a good look at defendant in the restaurant.  Griffin was able to identify Lee from surveillance video of her at McDonald's, not from seeing her on television. After seeing the video, Griffin identified Lee from the photograph Arnold showed her.  Griffin remembered what the trio ordered and how defendant yelled at Natalynn about the "Happy Meal" toy.

Griffin was pregnant at one point and nearly suffered a miscarriage due to stress from this case.  A man other than Arnold showed Griffin pictures and she could not identify Natalynn from the pictures he showed Griffin.  Griffin wanted the man to leave her alone.  The man kept coming to Griffin's home.  The man showed Griffin six-pack lineups that included six males including defendant and six females including Lee.  Griffin could not identify anyone in those lineups.  Griffin remembered seeing the little girl and the man who was mean to her at McDonald's.  The lineups had been prepared by Robert Gonzales, a defense investigator, and shown to Griffin.  The photographs Gonzales prepared were not in color but in black and white.  Gonzales denied the prosecutor's observation that the pictures were "pretty blurry."

Investigator Arnold obtained 600 hours of video recordings from the Tulare McDonald's from the time period between February 21, 2009, and March 26, 2009.  Arnold did not see defendant, Natalynn, or Lee in the recordings.  Arnold did not have exact dates from the witnesses.  There was one booth where the video cameras did not cover.  Arnold carefully viewed recordings from Friday evenings but scanned the remaining video images at fast forward. A defense investigator viewed the video recordings from the Tulare McDonald's and did not see defendant, Natalynn, or Lee in the recordings.

14

1

**Testimony of Defendant's Family**

2
3
4
5
6
7

Maria Jones, defendant's mother, remembered she was weeding in her yard on March 21, 2009, when defendant came over with Natalynn.  Natalynn bent down, lost her balance, and looked disoriented.  On March 22, 2009, she met defendant, Lee, and Natalynn at a restaurant for lunch.  Natalynn had a bruise on her forehead.  At lunch, Natalynn ate a little.  Later that day, defendant called Maria Jones.  He was very upset and said Natalynn got hurt.  Maria Jones could not recall what defendant said about how Natalynn was injured.  Maria Jones explained that on the way to the hospital with defendant, he was too devastated to talk about what happened except to say he did not know what happened to Natalynn.

8
9
10
11
12

Defendant's brother, Kenneth Jones, testified that on March 22, 2009, he went to lunch with defendant, Natalynn, Lee, and his parents.  He noticed a very large bruise on Natalynn's entire forehead.  One of Natalynn's nostrils was also red and appeared to be infected.  When Kenneth Jones asked Natalynn how she was bruised, she said she ran into a sliding glass door.  Natalynn did not eat very much at lunch.  Defendant told his brother he had swatted Natalynn on her bottom the day of her death.

13
14
15
16

Kenneth Jones never heard Natalynn complain that defendant played too rough with her.  Kenneth Jones asked Natalynn about a monster comment she had directed toward defendant.  Natalynn explained she and defendant had been playing by a window.  Natalynn was laughing and playful when she explained this to Kenneth Jones.  Natalynn also said she thought it may have been a dream.

17
18
19
20
21
22

Jennifer Clinton is defendant's sister.  Clinton described defendant as acting like a father to her eldest son when he was an infant and had colic.  Clinton was still living at home and defendant would get up at night and take care of the child.  A photograph taken by Clinton on March 12, 2009, was admitted showing defendant with Natalynn at a birthday party for Clinton's second son.  Defendant had a very special bond with both of Clinton's sons, including when they were both toddlers.  According to Clinton, Natalynn liked to play rough with her sons but defendant did not play rough with her and tried to teach Clinton's sons not to play as rough with girls as with boys.

23

**Defendant's Testimony**

24
25
26
27

Defendant explained that on one occasion when Lee and Natalynn were sleeping at his parents' house, Natalynn awoke from her sleep to complain there were monsters at the side of the house.  Defendant went outside to run off cats from the side of the house.  Natalynn saw defendant through a window and became scared until he showed her there was no monster.  Natalynn laughed and said Ry-ry was the monster.

28

Defendant's nephews liked to jump on him and wrestle.  Natalynn

15

became actively engaged in the horseplay with defendant and his nephews.  There were times when she would cry.  Defendant initially denied providing daycare for Natalynn while Lee worked but conceded he and his parents along with Miller and Rosales provided care as well as Natalynn's preschool.

Defendant explained there was an incident when Natalynn was spinning around and fell in his bedroom.  When Natalynn fell, she hit an exposed safe in the closet.  Natalynn seemed dazed.  Defendant helped her put ice on it.  Miller never picked up Natalynn from defendant's house.  Usually, Lee would take Natalynn to and from Miller's home in Tulare.  Defendant did go with Lee on some of these journeys.

Defendant denied ever stepping foot inside the McDonald's referred to by other witnesses.  Defendant had been to a McDonald's in Tulare at Bardsley, but never to the restaurant at Cross and J Street.  Defendant did go to a McDonald's in Visalia with Lee and Natalynn, or with Natalynn and his mother.

According to defendant, there were several times when Natalynn acted out in public by crying, "throwing a fit," refusing to eat her food, going under the table, or sitting on the table.  Defendant denied spanking Natalynn during any of these incidents.  Defendant said he did spank Natalynn on the bottom with his open hand on March 22, 2009.  He denied ever using his fist on Natalynn.  Defendant spanked Natalynn once at his parents' house when she started throwing toys.  Another time defendant spanked her in the restroom of a restaurant.

Defendant denied telling anyone he had no need for Natalynn.  Defendant said there was conflict in his relationship with Rosales.  Defendant said Rosales did not tell the truth.  Defendant insisted Natalynn wanted to be with him more than with Rosales and this caused conflict between Rosales and defendant.

Defendant explained that Lee and Natalynn moved into their new apartment on March 6, 2009.  The following day, defendant walked into Natalynn's bedroom and found her on top of her bed reaching into a dresser drawer to get a pair of socks.  When defendant asked Natalynn what she was doing, she was startled and fell off the bed and bruised her head.  It looked serious to defendant, who picked up Natalynn, got ice to put on her head, and drove her to Lee's place of work.  Lee looked at the injury and called her mother.  Defendant denied he intentionally scared Natalynn.

According to defendant, Natalynn ran into a sliding glass door about a week later.  On March 21, 2009, Natalynn came over to defendant and told him she put a shell up her nose.  Defendant said he carefully worked the shell out of Natalynn's nose with toilet paper and his fingers because he did not want to push the shell further into Natalynn's nostril.

On March 22, 2009, defendant went with Lee and Natalynn to a swap meet and then to a store before meeting defendant's parents

for lunch.  Defendant explained Lee left for work between 4:30 and 4:45 p.m.  Defendant described Natalynn as running back and forth between watching television, going in her bedroom, and working on crafts with her mother at the table.  When Lee left for work, Natalynn began crying.  Defendant warned Natalynn to stop but she continued, so defendant spanked her twice on the bottom.  Defendant said after he spanked Natalynn, she started running around again and ran into the wall, hitting her temple.  According to defendant, Natalynn whimpered a bit and rubbed her head.  Natalynn's head turned red.  Defendant kissed Natalynn's head and she continued to run.  As he was sitting and watching television, defendant heard a thud from Natalynn's room and called out to her.  When defendant heard nothing, he walked into the room and saw Natalynn on the floor hugging a sleeping bag cover.  Defendant thought she had fallen asleep.

Defendant said he lifted Natalynn up and placed her on her bed.  Natalynn's eyes were open but the pupils were rolled back and he could not see them.  Defendant panicked and called Natalynn's name but she did not respond.  Defendant took Natalynn to the kitchen and put her underneath the faucet to run water on her face.  Natalynn made a sucking sound like she was sucking the water in.  Her stomach was full and bloated like there was something in it and she was not breathing.  Defendant pushed Natalynn's stomach.  There was no response so defendant blew air into Natalynn's mouth.

Defendant brought Natalynn to the living room and laid her on the carpet.  He opened her mouth and was able to get his finger into the mouth as far as he could reach.  Nothing came out.  Defendant brought Natalynn back into the kitchen, started hitting her back, and called 911.  Defendant thought five or six minutes had passed from when he found Natalynn in her room to when he called 911.  Natalynn vomited some liquid.  Defendant said he was trying to save Natalynn.  Defendant took Natalynn outside right when the police and paramedics arrived.  Defendant asserted he did not know what happened to trigger Natalynn's condition.

*People v. Jones*, No. F068996, 2017 WL 2131425, at *1-13 (Cal. Ct. App. May 17, 2017), as

modified on denial of reh'g (June 6, 2017); *see also* ECF No. 14-57 at 3-25.

## II.      Discussion

### General Federal Habeas Legal Standards

A federal court may grant habeas relief when a petitioner shows that his custody violates

federal law.  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

(2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

17

1    Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*,

2    562 U.S. 86, 97 (2011).  To decide a § 2254 petition, a federal court examines the decision of the

3    last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*,

4    138 S. Ct. 1188, 1192 (2018).  We must defer to that decision, and cannot grant habeas relief for

5    any claim that was adjudicated on the merits in the state proceeding unless it was contrary to

6    clearly established federal law or based on an unreasonable determination of the facts. *See* 28

7    U.S.C. § 2254(d).

8         If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be."

9    *Richter*, 562 U.S. at 102.  As the Supreme Court has put it, federal habeas review "disturbs the

10   State's significant interest in repose for concluded litigation, denies society the right to punish

11   some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises

12   of federal judicial authority." *Id*. at 103 (citation omitted).  Our habeas review authority serves as

13   a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for

14   ordinary error correction through appeal." *Id*. at 102-03 (emphasis added).

15                    ***Petitioner's First Claim: Due Process on Appeal***

16        Petitioner's first claim is that the California Court of Appeal's "decision violated

17   petitioner's Fourteenth Amendment due process right to an 'adequate and effective' appeal"

18   because it relied "on material factual and legal errors to affirm the trial court's judgment and

19   sentence."  ECF No. 1 at 34 (quoting *Evitts v. Lucey*, 469 U.S. 387, 392 (1985)).[2]

20        As an initial matter, there is some dispute about the appropriate framework for evaluating

21   petitioner's first claim, which is unpacked in a series of numbered and lettered paragraphs that

22   allege a variety of substantive errors on direct appeal (some of which appear to merge with

23   petitioner's second and third claims, taken up below). *See* ECF No. 1 at 34-42.  In response,

24   _____

25   [2] Some of petitioner's individual allegations appear to concern purported errors of *state* law,
     which cannot form the basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67

26   (1991).  But petitioner's traverse clarifies that he wishes to assert no state-law claims. *See* ECF
     No. 18 at 13.  In addition, petitioner claims in passing that the Court of Appeal's opinion violated

27   his Sixth Amendment right to jury fact-finding, citing *Dillon v. United States*, 560 U.S. 817, 828
     (2010).  We can find no relevance for *Dillon*—which does not concern issues of appellate factual

28   interpretation or fact-finding—and see no issue here warranting habeas relief under § 2254.

18

respondent argues broadly and simply that "federal habeas relief is unavailable to redress independent claims of alleged procedural error in the state post-conviction review process."  ECF No. 13 at 22; *see Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) ("We join the majority [of circuits] and affirm the district court's holding that a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings."); *see also Silversky v. Frink*, 500 F. App'x 625, 626 (9th Cir. 2012) ("A federal habeas petition is not the proper vehicle for addressing the adequacy of process provided . . . in state post-conviction proceedings.").  In his traverse, petitioner contends that this response (and the cited decisions) "fences out federal habeas claims directed at state habeas (or other collateral) proceedings," but does not foreclose "claims based on state direct appellate review."  ECF No. 18 at 13.

We think it is fair to say that there is some ambiguity regarding the cognizability of certain habeas claims that stem solely from direct review of a conviction.[3]  However, even

---

[3] *Franzen*'s terse holding that "a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings," 877 F.2d at 26, was offered with little context, and there may be some question whether its holding applies both to collateral and direct review.  Its own terms appear to contemplate any "post-conviction review process," and the reasoning of more fulsome opinions on the subject may cover both direct review and collateral proceedings.  *See Bell-Bey v. Roper*, 499 F.3d 752, 756 (8th Cir. 2007) ("Because the Constitution does not guarantee the existence of state post-conviction proceedings, an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas application.") (internal quotations and citations omitted); *Ochoa v. John Ontiveros*, No. CV-05-3787-PHXDGCDKD, 2009 WL 1125320, at *8 (D. Ariz. Apr. 27, 2009) ("*Franzen* and the cases it cites are based on the fact that habeas proceedings are designed to attack the basis for the petitioner's detention, and a petitioner is not detained as a result of post-conviction proceedings."); *Hoffman v. Ryan*, No. CV163598PHXSPLJFM, 2017 WL 6021432, at *9 (D. Ariz. Sept. 14, 2017) ("[A]bsent a showing that the incarceration was unconstitutional, habeas has no interest in a purported constitutional violation, even if it occurs on post-conviction review of the criminal prosecution which resulted in the incarceration."); *see also Lackawanna Cty. Dist. Attorney v. Coss*, 532 U.S. 394, 402 (2001) ("[E]ach State has created mechanisms for both direct appeal and state postconviction review, even though there is no constitutional mandate that they do so.").  On the other hand, the Supreme Court has stated that, "if a State has created appellate courts as an integral part of the system for finally adjudicating the guilt or innocence of a defendant, the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution."  *Evitts v. Lucey*, 469 U.S. 387, 393 (1985).  *Evitts* itself held that a criminal defendant is constitutionally entitled to effective assistance of counsel on direct appeal.  *Id*.  In addition, some authorities do distinguish between "post-conviction process" and "direct review" of a conviction—and assume that a "post-conviction" process refers only to a collateral attack.  *See* Brian R. Means, Federal Habeas

1  assuming (without deciding) that petitioner's appellate claims are cognizable before us now,

2  petitioner has not established that he is entitled to relief on the basis of those claims.  We are

3  powerless to grant habeas relief to a state prisoner unless the state proceeding "resulted in a

4  decision that was contrary to, or involved an unreasonable application of, clearly established

5  Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision

6  that was based on an unreasonable determination of the facts in light of the evidence presented in

7  the State court proceeding."  28 U.S.C. § 2254(d).  Petitioner appears to be arguing that the

8  California Court of Appeal decision was contrary to "clearly established Federal law" under the

9  Supreme Court's decision in *Evitts v. Lucey*, 469 U.S. 387 (1985).[4]  Petitioner puts particular

10  emphasis on *Evitts*'s statement (citing *Griffin v. Illinois*, 351 U.S. 12, 20 (1956)) that appellate

11  review must be "adequate and effective" to comply with due process, and argues that his was not.

12  But *Evitts*—a case concerning the ineffective assistance of appellate counsel—provides no

13  "clearly established Federal law" to support petitioner's manifold claims here, which are that the

14  Court of Appeal opinion contained "factual mischaracterizations and omissions," interpreted facts

15  in a manner that is "contradicted by the record," "relied on its own appellate fact-finding and

16  credibility determinations," "applied the wrong standard of error review," "applied the wrong

17  standard of harmlessness," and "failed to consider the trial record as a whole."  ECF No. 1 at 35-

18  40.  Petitioner's claim, boiled down to its essence, is that the Court of Appeal made the wrong

19  substantive decision.  But the line of cases of which *Evitts* is a part—cases including *Griffin*,

20  _____

21  Manual § 1:44 (2020) ("[A]lleged errors by state courts in state post-conviction processes do not
raise a constitutional issue cognizable in a federal habeas application.  Rather, federal habeas

22  relief is available only to remedy constitutional errors at the trial or direct review level.").  Other
authorities assume that a direct appeal is one category of post-conviction review.  *See, e.g.*,

23  *Summers v. Schriro*, 481 F.3d 710, 715 (9th Cir. 2007) (referring to "all forms of post-conviction
review . . . other than direct appeal"); *Kitt v. Clarke*, 931 F.2d 1246, 1248 (8th Cir. 1991)

24  (referring to "postconviction proceedings other than the direct appeal").  Finally, we note that
some of these issues have produced circuit splits that appear to have gone unresolved for many

25  years.  *See Dickerson v. Walsh*, 750 F.2d 150, 152 (1st Cir. 1984).

26  [4] Petitioner does not claim that the Court of Appeal decision was "based on an unreasonable
determination of the facts in light of the evidence presented," and we do not believe it was.  Even

27  assuming that the Court of Appeal decision contained omissions or misinterpretations of the
factual record, the alleged errors are small in the overall context of the evidence and legal issues

28  presented, and could have led to no "unreasonable determination" of the facts.

above, and *Douglas v. California*, 372 U.S. 353 (1963)—concern only the minimal *procedural* safeguards that a state must offer on appeal, such as effective counsel and a copy of the trial transcript.  *See Dews v. Kern Valley State Prison*, No. 1:12-CV-00450-AWI, 2012 WL 2358643, at *5 (E.D. Cal. June 20, 2012) ("Although the Constitution does not require states to grant appeals as of right to criminal defendants seeking to review alleged trial court errors, if under state law criminal defendants have a right to appeal criminal convictions, the procedures used in deciding those appeals must comply with the requirements of the Due Process and Equal Protection Clauses of the Constitution.").  These cases do not deal with the substantive issues that petitioner now raises, and we know of no cases that do.  Indeed, petitioner's own filing before the California Supreme Court acknowledged this when it noted that the "case law has identified virtually no due process checks on the [appellate] opinion itself," and conceded that the scope of due process in this context remains "woefully unexplored."  ECF No. 14-50 at 18.  Because petitioner identifies no clearly "established Federal law" that the Court of Appeal violated, his first claim should be denied.

### Petitioner's Second Claim: Identification Evidence

Petitioner's second claim is that the trial court erred by erroneously admitting eyewitness identification evidence that was obtained in a suggestive manner.  *See* ECF No. 1 at 43.  Specifically, petitioner alleges that the trial court should not have admitted evidence of several incidents at McDonald's—in which petitioner was allegedly seen verbally abusing at the girl he was convicted of murdering—because the investigator showed the witnesses only a single photograph of petitioner, rather than an array.  *Id*.  The Supreme Court has held that such a procedure violates due process "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).  If the procedure used was indeed suggestive, courts must ask "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive."  *Neil v. Biggers*, 409 U.S. 188, 199 (1972).  Factors considered as part of the "totality of the circumstances" may include the quality of the witness's opportunity to view the defendant, the

1    witness's degree of attention, the accuracy of the witness's prior description, the level of certainty

2    demonstrated by the witness, and the length of time between the incident and the identification.

3    *See Perry v. New Hampshire*, 565 U.S. 228, 239 n.5 (2012).

4            The Court of Appeal's discussion of this issue was extensive and detailed, and we quote it

5    at length:

6            A due process violation occurs only if the identification procedure
         is so impermissibly suggestive as to give rise to a very substantial
7        likelihood of irreparable misidentification. (*Simmons v. United
         States* (1968) 390 U.S. 377, 384; *People v. Cook* (2007) 40 Cal.4th
8        1334, 1355.) A single person showup is not inherently unfair. A
         procedure is unfair that suggests the identity of the person
9        suspected by the police in advance of the witness's identification.
         (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 413.)
10

         Although a single-suspect identification procedure generally is not
11       the ideal or preferred method and can pose a danger of
         suggestiveness, it is not necessarily unfair. (*People v. Clark* (1992)
12       3 Cal.4th 41, 136, abrogation on other grounds recognized in
         *People v. Pearson* (2013) 56 Cal.4th 393, 462; *see People v.
13       Medina* (1995) 11 Cal.4th 694, 753.) Having a witness view a
         single photograph of the defendant is not more impermissibly
14       suggestive than an in-court identification of the defendant sitting at
         the defense table in the courtroom. (*People v. Yonko* (1987) 196
15       Cal.App.3d 1005, 1008-1009.) Other than the use of single
         photographs for each subject, there is nothing else in the record to
16       suggest Arnold encouraged Cardenas or Bentz to identify
         defendant. (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 39.) On
17       the other hand, the single-photograph procedure has been criticized.
         (*See People v. Contreras* (1993) 17 Cal.App.4th 813, 820.)
18       Assuming arguendo the procedure used here was unduly
         suggestive, we review the identification process under the totality
19       of the circumstances to determine if it was unfair.

20       Cardenas was contacted by Arnold about a year after Natalynn died.
         Cardenas, however, paid close enough attention to the incident and
21       had reported it to her supervisor. This incident was noteworthy
         because defendant told a very young child to "shut the fuck up"
22       four different times and left Natalynn crying at the table. Cardenas
         also cleaned the table next to defendant, Lee, and Natalynn and got
23       a good look at all three of them before they left the restaurant.
         Cardenas was certain of her identification at the time she made it to
24       Arnold and at defendant's trial. Although Cardenas was reluctant
         to identify Lee at defendant's trial, she explained this was because
25       she apparently did not want to look at Lee in the gallery. Cardenas
         was confident of her identification of defendant and Natalynn.
26

         Griffin was able to identify defendant and Natalynn. Griffin made
27       a positive identification of defendant in court. Arnold showed
         Griffin photographs. Griffin identified Natalynn from the girl in the
28       photograph Arnold showed her and identified defendant in court as

                                    22

the man she saw with Natalynn at McDonald's.  She got a good look at defendant in the restaurant.  Griffin was able to identify Lee from surveillance video of her at McDonald's, not from seeing her on television or from the photograph Arnold showed her.  Griffin remembered what the trio ordered and how defendant had yelled at Natalynn about the Happy Meal toy.

Bentz apparently had a clearer view of defendant and Natalynn than she did of Lee.  Bentz reported the incident to Arnold less than two months after it happened and less than two weeks after Natalynn died.  Bentz only saw Lee from behind while she sat but could see her profile as Lee left the restaurant.  It is reasonable to infer Bentz also saw Lee's body at the same time.  Because Bentz did not see the front of Lee's face during the McDonald's incident, she forthrightly told Arnold and testified at trial that Lee looked like the woman in the restaurant the day of the incident.

The unique circumstances of defendant's behavior—yelling at and nearly hitting a small child only three and a half years old—made both encounters uniquely memorable and noteworthy.  The witnesses were not identifying a single suspect to a crime occurring in a dark alley.  Defendant's conduct occurred inside a restaurant with presumably good lighting.  The witnesses were identifying a mother, her daughter, and the mother's boyfriend, who were dining together.  Bentz and Cardenas were sure of their identifications of defendant and Natalynn.  Griffin was positive of her identification of defendant, Lee, and Natalynn.  Also, Griffin was able to identify Lee from video recordings even though the defense investigator and Arnold could not definitely find any of the trio in video recordings.  All three witnesses positively identified defendant in court.  Such identifications need not be excluded, even where the witness previously failed to identify a suspect.  (*People v. Dominick* (1986) 182 Cal.App.3d 1174, 1196-1197; *see People v. Contreras*, *supra*, 17 Cal.4th at p. 822.)

It is far less probable three independent witnesses to two separate events would misidentify defendant under circumstances where the same three people were at the same restaurant in Tulare, a small community.  As noted above, Arnold did not directly encourage Cardenas, Griffin, or Bentz to positively identify defendant, Lee, or Natalynn. Furthermore, the circumstances of the photographic identification procedure were disclosed to the jury, the witnesses were subjected to thorough cross-examination, and the jury was allowed to evaluate the reliability of the witnesses' identifications.  (*People v. Alexander* (2010) 49 Cal.4th 846, 903.)  Evidence with some element of untrustworthiness is customary grist for the jury mill; jurors are not so gullible they cannot intelligently measure the weight of identification testimony with some questionable feature.  (*Ibid*.)  Under the totality of the circumstances, we find the identifications of defendant by Bentz, Griffin, and Cardenas were reliable.  We also find the identifications of Lee and Natalynn reliable under the totality of the circumstances.

*People v. Jones*, No. F068996, 2017 WL 2131425, at *14-15.

1     The Court of Appeal applied the correct standard and reached the correct result: under the

2  totality of the circumstances presented here—such as a highly memorable occurrence and

3  relatively confident identifications—the identifications were reliable, despite the degree of

4  suggestiveness involved in the single-photograph technique.  This result was not contrary to or an

5  unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).

6           ***Petitioner's Third Claim: Prosecutorial Misconduct***

7     Petitioner's third claim is that the prosecution committed misconduct in the closing

8  argument—and the trial court allowed it—depriving him of due process of law.  ECF No. 1 at 48.

9  Specifically, he alleges that the prosecution's use of a so-called "golden rule" argument—asking

10  the jury to put itself in the shoes of the victim—deprived him of a fair trial.  Such arguments can

11  "inappropriately obscure[] the fact that [the prosecutor's] role is to vindicate the public's interest

12  in punishing crime, not to exact revenge on behalf of an individual victim."  *Drayden v. White*,

13  232 F.3d 704, 713 (9th Cir. 2000)

14     The California Court of Appeal considered this issue.  While the court conceded that some

15  of the prosecutor's arguments were improper—and noted that objections to those arguments were

16  sustained at trial—the court concluded firmly that these limited comments did not deprive

17  petitioner of a fair trial:

18           A prosecutor who uses deceptive or reprehensible methods to
           persuade the jury commits misconduct.  Reversal under the federal
19           Constitution is necessary only when these methods infect the trial
           with such unfairness as to make the resulting conviction a denial of
20           due process.  (*People v. Salcido* (2008) 44 Cal.4th 93, 152, *citing
           Darden v. Wainwright* (1986) 477 U.S. 168, 181.)
21

22           . . . .

23           Although the trial court did not admonish the jury to disregard the
           prosecutor's comments at the time they were made, immediately
24           before closing arguments, the jury received instructions on the
           duties of the jury focusing on how the jurors decide the facts and
25           directing the jurors to not let bias, sympathy, or prejudice influence
           their opinion.  The jury received the reasonable doubt instruction
26           set forth in CALCRIM No. 220, emphasizing defendant's presumed
           innocence and stating the jury "must impartially compare and
27           consider all the evidence that was received throughout the entire
           trial."  The jury was further instructed with CALCRIM No. 222 on
28           its duty to decide the facts, evidence, the sworn testimony of
           witnesses, and exhibits admitted into evidence.  This instruction

1    admonishes the jury that the statements of the attorneys in opening
     and closing statements are not evidence and only the sworn
2    testimony of witnesses and admitted exhibits are evidence.  This
     instruction also advised the jury not to consider matters upon which
3    the court sustained an objection.

4    Jurors are presumed to understand and follow the trial court's
     instructions.  (*People v. Martinez, supra*, 47 Cal.4th at p. 957;
5    *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  These instructions
     effectively advised the jurors to focus on the evidence, avoid
6    passion in their deliberations, and to consider evidence over the
     arguments of counsel.  Defense counsel further effectively
7    challenged the prosecutor's argument, appealing in his own closing
     argument for the jury not to be moved by passion but to employ
8    reason to the evidence presented at trial.  These instructions,
     coupled with the trial court sustaining defense counsel's objections
9    to the prosecutor's victim impact comments, were sufficient to
     overcome any sympathy or prejudice evoked by the prosecutor.
10
     As noted, the scope of the prosecutor's comments was far less
11   extensive than the prosecutor's prolonged and far ranging
     comments in *Vance* [a related California precedent].  All of the
12   prosecutor's challenged closing argument occurred in five pages of
     reporter's transcript.  The prosecutor's closing statements were
13   about 71 pages of reporter's transcript.  Defendant counsel's
     closing statements were approximately 120 pages of reporter's
14   transcript.  The jury heard testimony from some 40 witnesses,
     including defendant.  Given the long duration of closing arguments
15   by both parties, the limited scope of the challenged argument, and
     the volume of testimony, we find the challenged argument to be a
16   small part of the argument to the jury and of the trial.  Unlike the
     prosecutor's closing argument in *Vance*, the prosecutor here never
17   disparaged defense counsel, limiting her disagreements with
     defense counsel in the interpretation of how Natalynn died based on
18   the evidence adduced at trial.

19   . . . .

20   It is not reasonably probable a result more favorable to defendant
     would have been reached absent the misconduct or with a curative
21   instruction.  (*People v. Arias* (1996) 13 Cal.4th 92, 161 [jury failed
     to reach verdict after lengthy deliberations on enhancements
22   ultimately dismissed].)  Given the strength of the People's case
     against defendant, there is no reasonable probability the
23   prosecutor's brief and isolated comments could have influenced the
     jury's guilt determination.  (*People v. Martinez, supra*, 47 Cal.4th
24   at p. 957; *People v. Medina* (1995) 11 Cal.4th 694, 759–760.)  The
     misconduct was not prejudicial given the very strong evidence of
25   defendant's guilt.  (*People v. Martinez, supra*, at p. 957; *People v.
     Mendoza, supra*, 42 Cal.4th at p. 704.)  We find no prejudicial error
26   under the state or federal Constitution.

27   *People v. Jones*, No. F068996, 2017 WL 2131425, at *17-20.

28

25

1      Here, the court identified the correct standard: "whether the comments so infected the trial

2 with unfairness as to make the resulting conviction a denial of due process." *Darden v.*

3 *Wainwright*, 477 U.S. 168, 169 (1986).  And the court amply weighed proper factors in deciding

4 whether than standard was met.  *See, e.g.*, *Hein v. Sullivan*, 601 F.3d 897, 912-13 (9th Cir. 2010)

5 ("In determining whether a comment rendered a trial constitutionally unfair, factors we may

6 consider are whether the comment misstated the evidence, whether the judge admonished the jury

7 to disregard the comment, whether the comment was invited by defense counsel in its summation,

8 whether defense counsel had an adequate opportunity to rebut the comment, the prominence of

9 the comment in the context of the entire trial and the weight of the evidence.").  Moreover, we

10 agree with the Court of Appeal that "the challenged argument [was] a small part of the argument

11 to the jury and of the trial," given "the long duration of closing arguments by both parties, the

12 limited scope of the challenged argument, and the volume of testimony."  Because the Court of

13 Appeal's analysis was proper, it was not contrary to clearly established federal law or based on an

14 unreasonable determination of the facts.  The court should not grant habeas relief on petitioner's

15 third claim.

16      ***Petitioner's Fourth Claim: Cumulative Error***

17      Petitioner's fourth and final claim is that the cumulative impact of the alleged errors above

18 deprived him of a fair trial.  ECF No. 1 at 51.  Cumulative error applies where, "although no

19 single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the

20 cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*,

21 78 F.3d 1370, 1381 (9th Cir. 1996).  But "[b]ecause there is no single constitutional error in this

22 case, there is nothing to accumulate to a level of a constitutional violation." *Mancuso v. Olivarez*,

23 292 F.3d 939, 957 (9th Cir. 2002).  Thus, petitioner's cumulative error claim fails.

24 **III.**     **Certificate of Appealability**

25      A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

26 court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

27 *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

28 district court to issue or deny a certificate of appealability when entering a final order adverse to a

petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the denial of a constitutional right.  Thus, we recommend that the court not issue a certificate of appealability.

**IV.      Findings and Recommendations**

The court should deny the petition for a writ of habeas corpus, ECF No. 1, and decline to issue a certificate of appealability.  These findings and recommendations are submitted to the U.S. District Court judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:    June 24, 2020                                    _____
                                                         UNITED STATES MAGISTRATE JUDGE

No. 205.

27