1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RYANN LYNN JONES,                     Case No.  1:18-cv-1606-ADA-HBK

12                    Petitioner,          AMENDED FINDINGS AND
                                           RECOMMENDATIONS TO DENY
13          v.                             PETITION FOR WRIT OF HABEAS
                                           CORPUS AND DECLINE TO ISSUE
14   DEAN BORDERS,                         CERTIFICATE OF APPEALABILTY[1]

15                    Respondent.          FOURTEEN-DAY OBJECTION PERIOD

16                                         (Doc. No. 1).

17

18          Petitioner Ryann Lynn Jones ("Petitioner" or "Defendant"), a state prisoner represented

19   by counsel, is proceeding on his petition for writ of habeas corpus filed under 28 U.S.C. § 2254.

20   (Doc. No. 1).  Respondent filed an answer to the petition on March 29, 2019.  (Doc. No. 13).

21   Petitioner filed a reply.  (Doc. No. 18).  On June 24, 2020, the previously-assigned magistrate

22   judge issued a findings and recommendations recommending the district court deny the petition.

23   (Doc. No. 20, "June 24 F&R").  Petitioner objected.  (Doc. No. 21).  After reviewing Petitioner's

24   objections, the district court referred this matter back to the now-assigned magistrate judge to

25   issue either an amended or supplemental findings and recommendations.  (Doc. No. 23).  The

26   _____

27   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
     (E.D. Cal. 2022).

28

1   district court found the June 24 F&R "misinterpreted and/or overlooked [Petitioner's] claim that

2   the California Court of Appeal decision was based on an unreasonable determination of the facts

3   in light of the evidence presented."[2]  (*Id.* at 2) (citing Doc. No. 21 at 4).  For the reasons discussed

4   below, the undersigned issues this Amended Findings and Recommendations and recommends

5   the district court deny the petition and decline to issue a certificate of appealability.

## I.  BACKGROUND

### A.  The Petition

The Petition raises the following four grounds for relief, with sub-parts:

> (1)  the California Court of Appeal violated Petitioner's Fourteenth Amendment due process right to an "adequate and effective" appeal and his Sixth Amendment right to jury fact-finding;
>
> (2)  the trial court violated Petitioner's Fourteenth Amendment due process rights by erroneously admitting evidence of uncharged McDonald's incidents despite Petitioner's unfairly suggestive and unreliable identification;
>
> (3)  the prosecutor committed prosecutorial misconduct during the closing argument with repeat, improper Golden Rule violations, magnified by the trial court allowing it, resulting in a fundamentally unfair trial;
>
> (4)  cumulative error arising from the aforementioned errors resulted in a fundamentally unfair trial.

(Doc. No. 1 at 34-51).  Grounds two through four were rejected by the California Court of

Appeal, Fifth Appellate District, in a reasoned opinion; grounds one through four were summarily

rejected by the California Supreme Court.  Respondent appears to concede the Petition is timely

and the claims are exhausted.  (*See generally* Doc. No. 13).  Respondent contends that Petitioner

---

[2] The district court quoting from the June 24 F&R noted it referred to the "unreasonable determination of facts argument" from the state court decision "only in passing" as follows:

> Petitioner does *not* claim that the Court of Appeal decision was 'based on an unreasonable determination of the facts in light of the evidence,' and we do not believe it was.  Even assuming that the Court of Appeal decision contained omissions or misinterpretations of the factual record, the alleged errors are small in the overall context of the evidence and legal issues presented, and could have led to no 'unreasonable determination' of the facts.

Doc. No. 23 at 2, n. 1 (emphasis added).

1    fails to sustain his burden of showing an entitlement to habeas relief on any of the grounds raised

2    in the Petition.  (See generally Doc. No. 13).

3        **B.  State Court Record**

4            On December 20, 2013, a jury convicted Petitioner of the lesser-included offense of

5    second-degree murder of Natalynn Miller ("Natalynn") and of assault causing the death of a

6    child.  (Doc. No. 14-8 at 38-39).  Following the jury's verdict and a sentencing hearing, the state

7    trial court sentenced Petitioner to a term of twenty-five years to life in prison.[3]  (Doc. No. 14-8 at

8    136).  On appeal, Petitioner's conviction was affirmed.  *People v. Jones*, No. F068996, 2017 WL

9    2131425, at *1-13 (Cal. Ct. App. May 17, 2017), as modified on denial of reh'g (June 6, 2017).

10   The California Supreme Court denied a petition for review.  *People v. Jones*, Case No. S242855

11   (Cal. 2017)).

12           The following summary provided by the California Court of Appeal provides an overview

13   of the facts and evidence gleaned from the trial.  A presumption of correctness applies to these

14   facts.  *See* 28 U.S.C. § 2254(e)(1); *Rushen v. Spain*, 464 U.S. 114, 120 (1983); *Crittenden v.*

15   *Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

16       ***Overview***

17           **Report of Child in Respiratory Arrest**

18           On Sunday March 22, 2009, at 5:41 p.m., Detective Jared Hughes
             of the Visalia police department was dispatched to investigate a
19           report of a nonbreathing child who was three and a half years old.
             Hughes arrived at the location two minutes later and saw defendant
20           running outside, holding a child in his arms.  Sergeant Randy
             Lentzner arrived at about the same time.  Defendant followed
21           Hughes's instruction to place the child down on the grass.  Hughes
             found Natalynn's skin cool to the touch and she was pale white.
22           Natalynn had no pulse, was soaking wet, and lifeless.  Hughes
             made sure Natalynn's throat was clear and tilted her head back.
23           Lentzner placed a breathing mask over Natalynn's face and gave
             her the first rescue breath.  Hughes saw Natalynn's chest rising.
24           They achieved a faint pulse and did not perform any chest
             compressions.  Paramedics arrived within two minutes and took
25           over Natalynn's care.

26

27   ---
     [3] Petitioner's fifteen year to life sentence for assault causing death to a child conviction carried was stayed
     due to his twenty-five to life sentence imposed for his second-degree murder conviction.  (Doc. No. 14-8
28   at 136).

3

Hughes briefly spoke to defendant and viewed the apartment. Hughes then followed Natalynn to the hospital. Most of her clothing had been removed. Hughes saw bruising on her chest, forehead, behind her ears, right shoulder, back, wrists, knee, inner thigh, and left nostril. After Natalynn was pronounced deceased, Hughes took photographs to document her injuries. The photographs were received into evidence.

Ryan Morgan was an EMT (emergency medical technician) paramedic dispatched to the emergency call along with his partner, EMT David Rodgers. Morgan determined Natalynn was not breathing and had no pulse; the cardiac monitor showed she was asystole, meaning she was dead. He and Rodgers administered life support by providing one hundred percent oxygen and performing compressions on Natalynn's chest. Natalynn was soaking wet from head to toe. It seemed strange she was so wet and still in her clothes. Morgan and Rodgers testified they had seen the officers performing chest compressions. Rodgers recalled Natalynn's airway was blocked, so he performed back blows to dislodge the blockage and performed hand CPR.

Morgan asked what happened. Defendant said Natalynn had been in her room and she had eaten pizza. Defendant then mentioned something about the bathroom and the tub. Morgan could not definitely remember who told him this information.

It took Natalynn four minutes to arrive to the hospital by ambulance. Natalynn arrived at the hospital intubated with a tube going into her lungs. Dr. Kealani Sine, a pediatric hospitalist, attended Natalynn at the hospital with the emergency room physician; she had no heart rate and was dead. Dr. Sine was suspicious that Natalynn's bruising was not caused by accidental trauma. Although she was already dead, Dr. Sine ordered a full body scan of Natalynn. Dr. Sine did not have the results of the scan. In Natalynn's condition, there was no chance emergency room doctors and nurses could revive her, but due to her young age they tried to do so for 15 minutes.

**Police Investigation**

Hughes spoke briefly to defendant, who appeared to have been crying and was pacing back and forth. Hughes briefly went to Natalynn's apartment while Natalynn was being attended to. Another officer walked defendant over to the apartment. Hughes asked defendant what happened. Defendant's initial response was he did not know. Defendant explained he was dating Natalynn's mother, Nicole Lee. Defendant told Hughes he did not live in the apartment and did not know the address. Hughes walked briefly into Natalynn's apartment. Natalynn's room was messy. A lower dresser drawer was pulled out and toys were scattered about.

Defendant did not know if Natalynn had been choking on something but she had been eating pizza 20 minutes earlier and was fine. Hughes followed the ambulance to the hospital and stayed with Natalynn. At the hospital, Hughes talked to Troy Miller,

4

Natalynn's father.  Miller was inconsolable.  Miller was crying and made several statements that Natalynn was killed.

At the hospital, Hughes contacted Natalynn's mother, Nicole Lee, after Natalynn died.  Lee was upset.  Defendant arrived at the hospital thereafter.  Lee had defendant view Natalynn with her and account for some of Natalynn's bruises.  Upon seeing Natalynn's body, Lee broke down and immediately pointed to a bruise on Natalynn's right temple.  Lee asked defendant, "'What's this?'" Lee asked defendant about a line across Natalynn's forehead.  In response, defendant turned to a nurse and asked if they had received scan reports of Natalynn's body.

Lentzner also went into Natalynn's apartment.  Another officer was with defendant in the apartment.  Lentzner briefly went into Natalynn's room and the bathroom.  There was residual water in the bathtub, which appeared to have been recently drained.  Lentzner took photographs of the apartment.  What looked like blood, vomit, and hair was on the kitchen counter next to the sink where defendant tried to revive Natalynn.  No human tissue, blood, or hair was collected from the apartment.  No holes were found in the walls of the apartment.  Photographs of the scene were admitted into evidence and shown to the jury.

Chris Moore lived in the apartment above Lee.  Moore woke up late on Sunday, March 22 with a hangover.  Moore was functioning fine and called for a pizza.  Moore heard a loud rumbling noise for about 15 minutes from the apartment below and believed it came from a video game.  He had not heard the noise before.  At some point the noise stopped.

Later, Moore heard a loud thumping noise on the wall at least six times.  It was not like a noise caused by hammering.  The noise was sequential and happened very quickly.  Moore described it as, "boom, boom, boom, boom, boom, boom." Moore then heard a voice saying, "'Come on, baby, wake up, baby.'" The noise was coming from directly beneath Moore.  Moore did not know the people and did not go downstairs.  Moore described himself as startled and shocked.

Linda Cavazos was also one of Lee's neighbors.  Cavazos did not remember hearing anything loud or unusual on March 22, 2009, but said she kept her television on loud.  She did remember hearing a bunch of sirens that day.

**Defendant's Statements to Investigators**

Detective Osvaldo Dominguez questioned defendant twice and recorded these sessions.  The first time was the day Natalynn died inside her apartment.  The audio recording of the questioning was played for the jury.  Defendant told Dominguez he and Natalynn were in the apartment alone.  Natalynn had been running around, doing crafts, and running back into her room.  Defendant said he heard a noise.  When defendant went into Natalynn's room to check on her, she was lying limp on the ground with her eyes rolled back.  Defendant took Natalynn to the sink, splashed water on her face,

and pushed on her stomach.  Natalynn began to vomit.  Defendant performed CPR.  Defendant panicked because Natalynn turned blue, so he called 911.  When asked if anything like this happened before, defendant said one time when Natalynn was spinning around she got dizzy and fell, hitting her head on a safe in the closet.

On March 25, 2009, Dominguez again questioned and recorded defendant about the circumstances leading to Natalynn's death.  The recording of the questioning session was played for the jury.  Defendant told Dominguez that on the morning Natalynn died, defendant went with her and Lee to a swap meet and had lunch with his mother.  They returned to their apartment about 1:15 p.m.  Natalynn and her mother played and made crafts until Lee left for work between 4:35 and 4:40 p.m.  Defendant was alone with Natalynn.

Defendant explained Natalynn became upset because her mother was leaving.  Natalynn was crying, running toward the door to catch her mother, and "threw a fit." Defendant told Natalynn to stop her tantrum or he would give her a spanking.  Defendant swatted Natalynn on the behind twice; she calmed down and started watching television.

According to defendant, Natalynn began to run around the kitchen island, switching directions.  Natalynn cut one turn too close and banged her head on the wall.  Natalynn looked at defendant and asked him to come over to her.  Defendant kissed Natalynn's head.  She whimpered a little and then kept running around.  Defendant went back to his recliner and could hear Natalynn playing with her toys.

Defendant had been playing the video game "Resident Evil 5."  Defendant did not worry about Natalynn being alone in her room because she was not very adventuresome.  As he was sitting in the living room, he heard a thud like Natalynn had jumped off her bed.  It was a real solid sound.  Defendant waited for Natalynn to cry.  He waited a few seconds, heard nothing, and got up from his chair.  Defendant said he found Natalynn up against the dresser.  He thought she had fallen asleep.  Defendant bent over and spoke to Natalynn, but she did not respond.  Defendant thought Natalynn was unconscious.  He brought her to the kitchen, splashed water on her, and noticed her mouth was open and her face was clenched.

Defendant pushed on Natalynn's stomach, which appeared bloated.  Natalynn was not breathing.  Defendant administered CPR and called 911.  Defendant also said that days earlier he told Natalynn to get her socks from her dresser.  When defendant entered her room, Natalynn was standing on her bed to reach into her dresser.  She was startled and fell from the bed, again hitting her head.

Defendant told investigators it was okay to spank a child and he had done so to Natalynn about five times.  Defendant knew no one who would want to abuse Natalynn and described Lee as being easy on her.  Defendant thought the bruises on Natalynn were from the time

6

she fell off her bed and the lesion on her nostril was from putting a freshwater clam shell up her nose.  Defendant described Natalynn as accident prone.  Dominguez showed defendant Natalynn's autopsy photographs depicting extensive bruising and told him Natalynn had massive bleeding between the scalp and her skull, bleeding in her brain, and bleeding in her stomach.  When Dominguez asked defendant how this could have happened, defendant had no explanation.

Defendant insisted he would never do anything to hurt Natalynn and did everything he could to save her life.  When it was pointed out defendant was with Natalynn and she had "hellacious bruises" that needed to be explained, defendant admitted there were "more bruises than her just bumping her head." Defendant conceded the bruises were "not from her doing" and had "to be from somewhere else."

Defendant was arrested on March 25, 2009, after he was questioned by police.

**Autopsy**

Dr. Burr Hartman was the forensic pathologist who conducted Natalynn's autopsy on March 24, 2009.  Natalynn was 37 inches tall and weighed 30 pounds.  During his external examination of Natalynn, Dr. Hartman observed many bruises and contusions on Natalynn's body.  There were bruises and injuries to Natalynn's abdomen, chest, back, and head.  After examining and photographing Natalynn's body, Dr. Hartman examined her internally.

Dr. Hartman found bruising along the midline of a portion of Natalynn's mesentery of the small colon, the transverse colon, and the sigmoid colon near the spine.  Dr. Hartman described this as abdominal trauma caused by a blow to the abdomen.  Abdominal injuries to children do not occur from CPR because the procedure is performed on the chest and mouth and the compressions used in CPR are too gentle to injure anything.  Dr. Hartman described Natalynn's abdominal injuries as acute because there was fresh bleeding from them.  It would be "very unusual" for a child Natalynn's age to have self-inflicted her abdominal injuries.

When he examined Natalynn's skull, Dr. Hartman did not find skull fractures, but he found bleeding under the skull beneath the dura mater covering the surface of the brain.  Dr. Hartman explained it would be exceptional for Natalynn to have caused these injuries unless she had some sort of mental illness.  Dr. Hartman described the photographs he had taken of Natalynn's body depicting the bruises and injuries.  The photographs were admitted into evidence.

Dr. Hartman explained a person has to be alive to form a bruise.  In Dr. Hartman's opinion, Natalynn's injuries were all acute, in close proximity to each other, and explained her death.  Dr. Hartman concluded Natalynn died from multiple blunt force trauma to the head, abdomen, and chest.  Although Dr. Hartman found no injury

7

to Natalynn's heart, he explained a sharp blow to the chest can cause commotio cordis—the stopping of the heart without showing an anatomic injury.  Natalynn's injuries occurred in close succession to one another.

**Medical Expert Opinions**

Dr. Frederic Bruhn, a board-certified pediatrician, testified as an expert on physical child abuse.  After reviewing all of Natalynn's medical records, Dr. Bruhn concluded Natalynn died from multiple blunt force trauma resulting from a nonaccidental homicide.  Dr. Bruhn further explained it was not likely Natalynn would have suffered subdural hematomas from falling off her dresser next to her bed or from falling off her bed.

Dr. Joseph Cohen is a forensic pathologist who contracts to perform autopsies in Marin and Napa Counties.  Dr. Cohen had conducted over 6,000 autopsies, hundreds of which were performed on children.  Dr. Cohen reviewed Natalynn's medical reports, reports of the paramedics, fire department reports, and preliminary hearing testimony from defendant's case.  Dr. Cohen concluded Natalynn's head injuries would have caused death in minutes, not hours.  Dr. Cohen also concluded Natalynn was already dead when paramedics and firefighters began to attend her.

Given the "package" of multiple bruises over Natalynn's body, Dr. Cohen did not believe her injuries were self-inflicted or accidental.  There could be some bruising from administration of CPR, but not to the extent of Natalynn's bruising and not when CPR is conducted on someone already dead.  Most of Natalynn's internal injuries could not have been caused by CPR, even if it was improperly performed.  One exception was bruising to her hilum behind the liver.  A small intestine injury would not occur during CPR on a dead person.  People frequently vomit during CPR or in the process of dying, which would explain the presence of vomit in the lungs.

Although Dr. Cohen did not find Dr. Hartman's autopsy report was perfect, the fact he did not take and study tissue samples from Natalynn was immaterial to understanding how Natalynn died.  While the injuries to Natalynn's abdomen were acute, she could have survived those injuries.  According to Dr. Cohen, Natalynn died from multiple blunt impact injuries to her head.  Dr. Cohen believed Natalynn's neurological deterioration was immediate after she was injured and she did not die from choking.

The defense called Max Jehle, an agricultural biologist and pest management specialist.  Jehle explained there is a species of freshwater mussel in California creeks and water sheds, including the Kaweah Reservoir.  The species is found in Mill Creek in Tulare County.  The mussels can pick up bacteria in the water from animal feces.  Among the pathogens found in water sources is E. coli.  Even in dry conditions, biofilms of bacteria can remain on the shells.  On cross-examination, Jehle said he had never personally tested clam shells.

8

Defendant called Dr. Harry Bonnell, a board-certified pathologist, who also reviewed Natalynn's relevant medical records.  Dr. Bonnell also reviewed the testimony of Dr. Bruhn.  Dr. Bonnell explained that not all subdural hematomas are lethal.

Dr. Bonnell disagreed with the other doctors that Natalynn died from blunt force trauma.  Dr. Bonnell believed Natalynn died from choking and asphyxiation.  Further, in Dr. Bonnell's opinion, Natalynn's subdural hematomas were too small to cause death.  Dr. Bonnell stated the bruising on Natalynn's chest could have been caused by chest compressions given to her during CPR.  Dr. Bonnell cited recent forensic studies of injuries misinterpreted as being caused by third parties but were the result of CPR.  Dr. Bonnell believed many of Natalynn's injuries could be explained by the CPR she received, including injuries and bruising to her upper chest, abdominal bleeding, and injuries to the chin, back, and mouth.

Defendant called David Satterlee, a flight paramedic and expert on resuscitation.  Satterlee explained that back blows like the ones the paramedics gave Natalynn were inappropriate in a child older than one year.  Additionally, reaching into a patient's mouth to dislodge food or other obstructions is also problematic because it can push the obstruction deeper.  Satterlee thought Natalynn's bruising on her back, chin, and chest were consistent with CPR.  Satterlee could not rule out the infliction of trauma on Natalynn as the cause of her bruises and injuries.

**Prior Injuries to Natalynn**

Troy Miller, Natalynn's father, testified he was in a relationship with Nicole Lee for six years and Natalynn was born to them in June 2005.  Miller and Lee separated in 2007 when Natalynn was about two years old.  Lee had custody of Natalynn and initially lived with their mutual friend, Jessica Rosales.  Miller had Natalynn every other weekend and every other Tuesday and Wednesday.  Miller eventually rented a house in Tulare about a mile from the McDonald's restaurant discussed later.

Miller described Natalynn as a playful, happy, polite, and well-mannered child.  Natalynn was healthy.  Natalynn took no medications, she was not accident prone, she was active, and she played well with other children.  Natalynn was also respectful of adults.  Miller described Natalynn as being coordinated.  She liked to climb up the ladder on her bunkbed.  Natalynn was not a risk taker and was not hyperactive.  Miller described her as calm and truthful.

Lee started dating Andrew Rose.  Natalynn liked Rose and would always talk about him.  Miller told Lee that if she was going to date, it would be better if she did not bring Natalynn over to the date's home unless it was a serious, long-term relationship.  Miller offered to take Natalynn, and she came over to Miller's home sometimes when Lee was dating Rose.  Natalynn was always happy to see her mother when Lee picked her up from Miller's home.

9

Sometime during August 2008, Miller learned Lee was dating defendant, whom Natalynn called "Ry-ry." Miller was concerned Lee was taking Natalynn to sleep over at defendant's house. When Lee's relationship with defendant started, Miller did not notice anything different or unusual in Natalynn's demeanor.

Between September and October, however, Miller started noticing injuries on Natalynn, including bruising on her chest and abrasions on her side. On one occasion, Natalynn attributed an abrasion and scratch to falling off her bike. On another, she said defendant had punched her, and she demonstrated a punching motion. There was another time when Natalynn demonstrated to Miller how defendant had grabbed her and thrown her into what Natalynn described as a "safety sink." Miller later learned the safety sink was actually a metal safe.

Miller noticed the bruises when he bathed Natalynn. In October 2008, Miller also noticed Natalynn had a bowel movement in her pants, which he found strange because she was potty trained. While cleaning Natalynn, he noticed marks inconsistent with a rash. Miller asked Natalynn if someone had spanked her and Natalynn got quiet, would not answer Miller, and became teary eyed. Shown a photograph depicting two bruises on Natalynn's chest, Miller explained they were knuckle sized. When asked how she got these bruises, a teary-eyed Natalynn said defendant was fighting with her.

Miller told Lee during a telephone conversation that Natalynn informed him defendant was fighting with her and asked Lee what was going on. Lee told Miller they were just play fighting. Miller told Lee he was not cool with an adult who could not control his strength when playing with his three-year-old daughter. Lee told Miller to "F off" and to mind his own business.

Miller was shown a diagram depicting Natalynn in December 2008, with a strawberry scrape mark and abrasion on her right side. Natalynn told Miller she had fallen off a bike when she was with defendant. Natalynn said defendant was watching her. Miller confronted Lee and told her not to leave Natalynn alone with defendant. One time Natalynn was in pain when Miller picked her up. The jury was shown a diagram depicting Natalynn's injuries. This was the incident when Natalynn was thrown into a safe. Lee had told Miller Natalynn was spinning around and fell into a box. Natalynn was upset and trembling as she related what happened. She told Miller she was afraid of defendant.

Natalynn asked Miller to tell Lee she did not want to be around defendant anymore. When Miller asked Natalynn why, she replied defendant hurts her. Miller told Natalynn they would both talk to Lee. Natalynn told Miller she could not talk to her mother and Miller had to do it for her. Natalynn told Miller she wanted to live with him, not with her mother. Miller talked to Lee with Natalynn present. Later, Miller called Lee on the telephone. Miller gave Lee a second warning that if this ever happened again, Miller would "find that mother fucker and . . . kill him." Lee promised never to

let Natalynn around defendant again.  Natalynn was elated when Miller told her about her mother's promise not to let defendant watch her again.

Miller was shown another diagram depicting a bruise on Natalynn's head after she supposedly ran into sliding door.  For a period of time, Natalynn was very happy during February 2009 and did not speak about defendant anymore.  Miller never contacted the police or CPS.  In March 2009, Miller understood Lee and Natalynn were moving into an apartment.  Natalynn never told Miller that Lee, who had apparently broken up with defendant, had gotten back together with him.  Miller was unaware Lee, Natalynn, and defendant were living together in the apartment in March of 2009.

Earlier in March 2009, Miller saw a large bruise on Natalynn, depicted in a diagram at trial.  The bruising subsided, but was still visible on Natalynn on March 18, 2009.  Natalynn told Miller she was with defendant when the injury happened.  Natalynn was constantly crying and upset during this time when he questioned her.  Natalynn stayed with Miller on March 18 and he was still unaware defendant was living with Lee.  Natalynn was very happy during her stay with Miller, but her demeanor totally changed when her mother was about to pick her up.  She began crying.  Lee decided to let Natalynn stay with Miller that evening.

The same evening, Miller bathed Natalynn and saw no new bruises on her.  Miller got Natalynn ready for school the next morning and Lee picked her up.  Miller had to carry Natalynn out because she did not want to go.  Natalynn just sat in the car crying.  She did not look up at Miller.  Miller told Natalynn not to be upset because it was Thursday, and on Friday Natalynn would be staying with him.  Miller expected to see Natalynn that weekend.  Instead, he received a call from Lee's mother telling him Natalynn had choked on a piece of pizza, died, and was at the hospital.  Miller found Natalynn with her nose smashed sideways on her face and so many bruises on her head and chest he could not count them all.

Ernesto Rosales (Ernesto), Jessica Rosales's brother, said Natalynn was a lovable little girl, and his sister would often take care of her.  Ernesto had moved to Texas but was visiting his sister in 2008 and went out with Lee and defendant to a bar.  Defendant talked to Ernesto about Lee being his girlfriend and said Natalynn was a cute little girl, but "he had no use for her around him." Ernesto thought defendant was drunk when he made these comments.

Jessica Rosales knew Troy Miller before she knew Lee, but Rosales considered Lee to be her best friend.  After Lee was having problems with Miller, she and Natalynn moved in with Rosales.  Miller briefly moved in with Rosales and Lee, but the situation did not work out.  Rosales sided with Lee and was in an argument with Miller.  Rosales and Lee were both working.  Rosales helped Lee with babysitting and would pick up Natalynn from preschool.  Rosales would watch Natalynn every day while Lee was at work and on weekends if Lee was working.  Rosales acted like Natalynn's mother and actually spent more time with her than Lee.

11

1

2      Rosales described Natalynn as a well-mannered, respectful, and
       truthful child.  Natalynn was healthy until her death and did not
3      require any special medication.  Natalynn was not accident prone
       and did not take risks.  Prior to Lee dating defendant, Rosales did
4      not see injuries or bruising on Natalynn except on one occasion
       when she fell off her tricycle and hurt her knee.  Natalynn had a
5      positive relationship with Andrew Rose while Lee dated him.
       Rosales never saw Natalynn injured during the time she was around
6      Rose.

7      Lee began to date defendant in August 2008.  Natalynn interacted
       well with defendant when he first started dating Lee.  At some
8      point, Lee would spend the night with defendant, who lived with
       his parents.  Natalynn would either stay with Rosales or with Lee.
9      During October and November 2008, Natalynn seemed scared
       about going to defendant's house.  Natalynn asked to stay with
10     Rosales all the time.  During this time period, Rosales also began to
       notice injuries on Natalynn that would always occur when Natalynn
11     was with defendant.  Defendant would watch Natalynn when
       Rosales was unavailable.

12     Rosales saw a bruise on Natalynn's left cheek in December 2008.
       Rosales asked Natalynn how she was injured but Natalynn said she
13     could not remember and looked down at the ground.  Rosales also
       saw a bruise on Natalynn's right cheek, along with a cut on the
14     cheek and a cut, swollen lip on December 29, 2008.  The lip was
       cut on the inside.  When Rosales asked Natalynn what happened,
15     Natalynn replied she could not say "because mommie would get
       mad."  Golden ruleRosales persisted and Natalynn told Rosales and
16     two of Rosales's friends that defendant did it.  Rosales took a
       photograph of this injury.  This photograph was admitted into
17     evidence and shown to the jury.  Rosales did not take the
       photograph because of the injury, but because she liked taking
18     pictures of Natalynn.

19     Diagrams were admitted depicting burns on Natalynn's ears and a
       bruise on her right shoulder that Rosales saw on February 26, 2009.
20     Rosales took Natalynn to a clinic to be examined by her friend
       Beatrice Manriquez.  Natalynn did not tell Rosales how she
21     received these injuries.  Natalynn was always happy staying with
       Rosales for the night, but did not want to go to defendant's house.
22     Beatrice Manriquez confirmed she examined Natalynn at the clinic
       and corroborated Rosales's account of Natalynn's injuries.

23
       The first week in March 2009, Lee and Natalynn moved out of
24     Rosales's home and into their own apartment.  Rosales later learned
       defendant was living with Lee and Natalynn.  On March 7, 2009,
25     Lee was to bring Natalynn to Rosales's home.  Before bringing
       Natalynn over, Lee called to explain Natalynn had had an accident.
26     When defendant brought Natalynn, Rosales saw a large knot on her
       head.  Rosales photographed the injury, which was admitted into
27     evidence and shown to the jury.  Rosales described the knot as the
       size of a small apple.  Natalynn acted lethargic and tired.  Rosales
28     asked defendant what happened.  Defendant said when Natalynn

12

was reaching into a drawer to get socks, he entered her room and said boo; Natalynn fell and hit her head.  On Lee's instructions, Rosales woke Natalynn from her sleep every 20 or 30 minutes.  Lee told Rosales not to take Natalynn to the emergency room.

Rosales saw Natalynn two or three times after that.  The last time Rosales saw Natalynn was on March 20, 2009.  The prior injury was still on Natalynn's forehead, but she had no new injuries.  Natalynn acted like a normal three-year-old.  Rosales took Natalynn to a friend's house to watch a movie.  Defendant made an angry call to Rosales asking where "the fuck" she was because he was waiting outside Rosales's house to pick up Natalynn.  Rosales got angry at defendant and hung up on him.  She and her friend brought Natalynn back to her home.

Defendant was next to his vehicle, yelling.  Lee was looking down.  Defendant yelled that Natalynn was not her daughter and questioned why Rosales took so long.  Rosales tried to have Natalynn stay with her that evening.  Rosales handed Natalynn over to Lee and asked her why she let defendant talk that way.  Lee took Natalynn.  March 20, 2009, was the last time Rosales saw Natalynn.

Natalynn's preschool teacher did not see Natalynn injured at school.  The teacher did see a substantial knot on Natalynn's forehead prior to her death.  Joclyn Paez had a small daycare and started watching Natalynn when she was between a year-and-a-half and two years old.  Natalynn was sometimes picked up by Miller, Rosales, or Lee.  Natalynn never got hurt while at the daycare and was not accident prone.  Natalynn was healthy, played well with the other children, and was not a climber.  Natalynn's demeanor was always excited when her father picked her up but not excited when Rosales picked her up.  One time Natalynn "threw a fit" when Rosales picked her up.  Andrew Rose would also pick up Natalynn.  Natalynn liked Rose a lot.

Lee enrolled Natalynn into preschool.  In February 2009, Lee had Paez babysit Natalynn again two days a week.  When Paez cared for Natalynn the second time, her behavior was changed and she was quiet and timid.  Natalynn would have no reaction when Lee picked her up.  Paez never watched Natalynn after March 5, 2009.

**Incidents at McDonald's**

Three witnesses saw defendant berate Natalynn at McDonald's on two occasions when her mother was also there.  Two witnesses reported the incidents to investigators within weeks of Natalynn's death.  One witness had seen pictures of Natalynn and defendant in news stories before telling investigators.  One of the workers at McDonald's recognized Natalynn and defendant from video images taken by the restaurant.

Frank Arnold investigated Natalynn's death for the district attorney's office.  Arnold questioned Tracy Dysart Griffin, Debra Bentz, and Sabina Cardenas about incidents that had occurred at the McDonald's at Cross and J Streets in Tulare involving defendant,

13

Lee, and Natalynn.  The three witnesses were shown Department of Motor Vehicle photographs of Lee and defendant and a family photograph of Natalynn.  Arnold explained he used these three photographs because they were the highest quality pictures he obtained.

Because he was not investigating a crime at the McDonald's itself, Arnold did not use a six-pack photographic lineup with the subject as one of the six people in the lineup.  None of the witnesses gave Arnold a prior physical description of defendant.  Arnold prepared a standard photographic array that included other pictures as well as defendant's picture, but did not use it.

Sabina Cardenas was questioned by Arnold a year after Natalynn's death.  She worked at the McDonald's on J Street in February 2009 between 6:00 a.m. and 1:00 p.m. on weekdays.  One midmorning, Cardenas was at her register when she heard a little girl crying.  The little girl was sitting at a booth with a man shouting at her.  There was also a young lady at the table.  The man yelled at the little girl three or four times to "'Shut the fuck up.'" The young woman was just sitting there.  Cardenas was close enough to view all three people, including the man.

Cardenas began cleaning an area near the booth the trio were sitting at.  Defendant pounded the table with his fists.  Cardenas identified Natalynn from a photograph.  She identified defendant in court as the man yelling at Natalynn.  Cardenas remembered what they looked like but did not see Lee as clearly because she had her head down.  Cardenas would not look out into the gallery to identify Lee, who was apparently observing the trial.  Cardenas reported the incident to her manager.

On April 2, 2009, Debra Bentz talked to Arnold about an incident she witnessed at the McDonald's on J Street in February 2009.  Bentz was dining in a booth with three of her grandchildren one weeknight evening.  The grandchildren were between 10 and 13 years old.  A little girl was sitting in a high chair with a man and a woman.  Bentz and the man were facing one another.  Bentz had not seen these people before.  Bentz made eye contact with the little girl and they smiled at each other.

While Bentz was sitting at the booth, the man suddenly raised his left arm and came down to strike the girl's temple with his fist clenched.  He stopped his swing right before he would have hit the girl.  The man had a grimaced look for several seconds.  Bentz was frightened and thought the child's life was in danger and almost jumped up out of her seat.  The man told the girl, "'You might get away with that with them, but you won't get away with that with me.'"  The girl looked at Bentz, put her head down, and looked frightened.  As the man spoke, he left his fist next to the girl's head.  The man appeared as though he was trying to get a grip over himself.  Bentz described the man's demeanor as angry.  The woman in the booth did not say or do anything.

Bentz got a good look at the man and the little girl.  Later, Bentz

14

saw a picture on the news of the man and of a little girl who had been killed; she also saw pictures in a newspaper article. They were the same people Bentz had seen in the restaurant. Bentz identified Natalynn as the girl she saw in McDonald's by her photograph and identified defendant in court as the man who threatened Natalynn. Bentz did not see Lee's face directly because Lee was sitting with her back to Bentz. Bentz saw a side view of Lee when Lee left the restaurant. Bentz did recognize Lee from her picture. Bentz was never shown photographic lineups with a display of six women. Arnold did not name Lee, defendant, or Natalynn when he showed Bentz individual photographs of them.

Bentz particularly recalled defendant's eyes and the grimace on his face as he threatened Natalynn. Bentz was contacted twice by Arnold, most recently in 2013. Arnold did show Bentz photographs of different males and Bentz identified defendant. Although she was not positive, Bentz thought she was with her grandchildren on a Thursday or Friday evening because her husband works those evenings and he was not with them. Bentz did not need a photograph of defendant in order to identify him.

Tracy Griffin (formerly Dysart) talked to Arnold on April 1, 2009. She started working at the J Street McDonald's in July 2008 and stopped working there at the end of April 2009. In February 2009, Griffin worked from 7:00 a.m. to 3:00 p.m. between four and five days a week but she did not work weekends. In February or March of 2009, after 10:30 a.m., Griffin was working the front counter when she saw a little girl playing with her food and wanting her toy. A man at the table did not want the girl to play with the food and the toy, he wanted her to sit down. When the girl did not comply, the man reached across the table, grabbed her by the left arm, and pulled her down to sit. The girl fell to her knees in the process. Griffin had seen the man in the restaurant several times, but only remembered the one incident.

Griffin got a fairly good look at the people at the table and could see the girl's face; the little girl looked scared. Griffin reported the incident to her manager. Arnold showed Griffin photographs. Griffin identified Natalynn from the girl in the photograph Arnold showed her and identified defendant in court as the man she saw with Natalynn at McDonald's. She got a good look at defendant in the restaurant. Griffin was able to identify Lee from surveillance video of her at McDonald's, not from seeing her on television. After seeing the video, Griffin identified Lee from the photograph Arnold showed her. Griffin remembered what the trio ordered and how defendant yelled at Natalynn about the "Happy Meal" toy.

Griffin was pregnant at one point and nearly suffered a miscarriage due to stress from this case. A man other than Arnold showed Griffin pictures and she could not identify Natalynn from the pictures he showed Griffin. Griffin wanted the man to leave her alone. The man kept coming to Griffin's home. The man showed Griffin six-pack lineups that included six males including defendant and six females including Lee. Griffin could not identify anyone in those lineups. Griffin remembered seeing the little girl and the man

15

who was mean to her at McDonald's.  The lineups had been prepared by Robert Gonzales, a defense investigator, and shown to Griffin.  The photographs Gonzales prepared were not in color but in black and white.  Gonzales denied the prosecutor's observation that the pictures were "pretty blurry."

Investigator Arnold obtained 600 hours of video recordings from the Tulare McDonald's from the time period between February 21, 2009, and March 26, 2009.  Arnold did not see defendant, Natalynn, or Lee in the recordings.  Arnold did not have exact dates from the witnesses.  There was one booth where the video cameras did not cover.  Arnold carefully viewed recordings from Friday evenings but scanned the remaining video images at fast forward.  A defense investigator viewed the video recordings from the Tulare McDonald's and did not see defendant, Natalynn, or Lee in the recordings.

**Testimony of Defendant's Family**

Maria Jones, defendant's mother, remembered she was weeding in her yard on March 21, 2009, when defendant came over with Natalynn.  Natalynn bent down, lost her balance, and looked disoriented.  On March 22, 2009, she met defendant, Lee, and Natalynn at a restaurant for lunch.  Natalynn had a bruise on her forehead.  At lunch, Natalynn ate a little.  Later that day, defendant called Maria Jones.  He was very upset and said Natalynn got hurt.  Maria Jones could not recall what defendant said about how Natalynn was injured.  Maria Jones explained that on the way to the hospital with defendant, he was too devastated to talk about what happened except to say he did not know what happened to Natalynn.

Defendant's brother, Kenneth Jones, testified that on March 22, 2009, he went to lunch with defendant, Natalynn, Lee, and his parents.  He noticed a very large bruise on Natalynn's entire forehead.  One of Natalynn's nostrils was also red and appeared to be infected.  When Kenneth Jones asked Natalynn how she was bruised, she said she ran into a sliding glass door.  Natalynn did not eat very much at lunch.  Defendant told his brother he had swatted Natalynn on her bottom the day of her death.

Kenneth Jones never heard Natalynn complain that defendant played too rough with her.  Kenneth Jones asked Natalynn about a monster comment she had directed toward defendant.  Natalynn explained she and defendant had been playing by a window.  Natalynn was laughing and playful when she explained this to Kenneth Jones.  Natalynn also said she thought it may have been a dream.

Jennifer Clinton is defendant's sister.  Clinton described defendant as acting like a father to her eldest son when he was an infant and had colic.  Clinton was still living at home and defendant would get up at night and take care of the child.  A photograph taken by Clinton on March 12, 2009, was admitted showing defendant with Natalynn at a birthday party for Clinton's second son.  Defendant

16

had a very special bond with both of Clinton's sons, including when they were both toddlers.  According to Clinton, Natalynn liked to play rough with her sons but defendant did not play rough with her and tried to teach Clinton's sons not to play as rough with girls as with boys.

**Defendant's Testimony**

Defendant explained that on one occasion when Lee and Natalynn were sleeping at his parents' house, Natalynn awoke from her sleep to complain there were monsters at the side of the house.  Defendant went outside to run off cats from the side of the house.  Natalynn saw defendant through a window and became scared until he showed her there was no monster.  Natalynn laughed and said Ry-ry was the monster.

Defendant's nephews liked to jump on him and wrestle.  Natalynn became actively engaged in the horseplay with defendant and his nephews.  There were times when she would cry.  Defendant initially denied providing daycare for Natalynn while Lee worked but conceded he and his parents along with Miller and Rosales provided care as well as Natalynn's preschool.

Defendant explained there was an incident when Natalynn was spinning around and fell in his bedroom.  When Natalynn fell, she hit an exposed safe in the closet.  Natalynn seemed dazed.  Defendant helped her put ice on it.  Miller never picked up Natalynn from defendant's house.  Usually, Lee would take Natalynn to and from Miller's home in Tulare.  Defendant did go with Lee on some of these journeys.

Defendant denied ever stepping foot inside the McDonald's referred to by other witnesses.  Defendant had been to a McDonald's in Tulare at Bardsley, but never to the restaurant at Cross and J Street.  Defendant did go to a McDonald's in Visalia with Lee and Natalynn, or with Natalynn and his mother.

According to defendant, there were several times when Natalynn acted out in public by crying, "throwing a fit," refusing to eat her food, going under the table, or sitting on the table.  Defendant denied spanking Natalynn during any of these incidents.  Defendant said he did spank Natalynn on the bottom with his open hand on March 22, 2009.  He denied ever using his fist on Natalynn.  Defendant spanked Natalynn once at his parents' house when she started throwing toys.  Another time defendant spanked her in the restroom of a restaurant.

Defendant denied telling anyone he had no need for Natalynn.  Defendant said there was conflict in his relationship with Rosales.  Defendant said Rosales did not tell the truth.  Defendant insisted Natalynn wanted to be with him more than with Rosales and this caused conflict between Rosales and defendant.

Defendant explained that Lee and Natalynn moved into their new apartment on March 6, 2009.  The following day, defendant walked

17

into Natalynn's bedroom and found her on top of her bed reaching into a dresser drawer to get a pair of socks.  When defendant asked Natalynn what she was doing, she was startled and fell off the bed and bruised her head.  It looked serious to defendant, who picked up Natalynn, got ice to put on her head, and drove her to Lee's place of work.  Lee looked at the injury and called her mother.  Defendant denied he intentionally scared Natalynn.

According to defendant, Natalynn ran into a sliding glass door about a week later.  On March 21, 2009, Natalynn came over to defendant and told him she put a shell up her nose.  Defendant said he carefully worked the shell out of Natalynn's nose with toilet paper and his fingers because he did not want to push the shell further into Natalynn's nostril.

On March 22, 2009, defendant went with Lee and Natalynn to a swap meet and then to a store before meeting defendant's parents for lunch.  Defendant explained Lee left for work between 4:30 and 4:45 p.m.  Defendant described Natalynn as running back and forth between watching television, going in her bedroom, and working on crafts with her mother at the table.  When Lee left for work, Natalynn began crying.  Defendant warned Natalynn to stop but she continued, so defendant spanked her twice on the bottom.  Defendant said after he spanked Natalynn, she started running around again and ran into the wall, hitting her temple.  According to defendant, Natalynn whimpered a bit and rubbed her head.  Natalynn's head turned red.  Defendant kissed Natalynn's head and she continued to run.  As he was sitting and watching television, defendant heard a thud from Natalynn's room and called out to her.  When defendant heard nothing, he walked into the room and saw Natalynn on the floor hugging a sleeping bag cover.  Defendant thought she had fallen asleep.

Defendant said he lifted Natalynn up and placed her on her bed.  Natalynn's eyes were open but the pupils were rolled back and he could not see them.  Defendant panicked and called Natalynn's name but she did not respond.  Defendant took Natalynn to the kitchen and put her underneath the faucet to run water on her face.  Natalynn made a sucking sound like she was sucking the water in.  Her stomach was full and bloated like there was something in it and she was not breathing.  Defendant pushed Natalynn's stomach.  There was no response so defendant blew air into Natalynn's mouth.

Defendant brought Natalynn to the living room and laid her on the carpet.  He opened her mouth and was able to get his finger into the mouth as far as he could reach.  Nothing came out.  Defendant brought Natalynn back into the kitchen, started hitting her back, and called 911.  Defendant thought five or six minutes had passed from when he found Natalynn in her room to when he called 911.  Natalynn vomited some liquid.  Defendant said he was trying to save Natalynn.  Defendant took Natalynn outside right when the police and paramedics arrived.  Defendant asserted he did not know what happened to trigger Natalynn's condition.

1    *People v. Jones*, No. F068996, 2017 WL 2131425, at *1-13 (Cal. Ct. App. May 17, 2017), as

2    modified on denial of reh'g (June 6, 2017); *see also* Doc. Nos. 13-1 at 1-40; 14-57 at 1-40; 14-58

3    at 1-2 (modifying initial order, but no change in judgment).

## II. APPLICABLE LAW

5    **AEDPA General Principles**

6         A federal court's statutory authority to issue habeas corpus relief for persons in state

7    custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

8    Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

9    first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

10   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

11   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

12   the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*,

13   136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a

14   claim adjudicated on the merits, but only if the adjudication:

15
16
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

17
18
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

19   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

20   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

21        "Clearly established federal law" consists of the governing legal principles in the

22   decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

23   U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

24   unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

25   to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

26   governing law set forth by Supreme Court case law; or (2) reached a different result from the

27   Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

28   12, 16 (2003).  A state court decision involves an "unreasonable application" of the Supreme

Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

As discussed earlier, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard.

1    When the relevant state-court decision on the merits is not accompanied by its reasons,

2              the federal court should "look through" the unexplained decision to
3              the last related state-court decision that does provide a relevant
              rationale. It should then presume that the unexplained decision
4              adopted the same reasoning.  But the State may rebut the
              presumption by showing that the unexplained affirmance relied or
5              most likely did rely on different grounds than the lower state court's
              decision, such as alternative grounds for affirmance that were briefed
6              or argued to the state supreme court or obvious in the record it
              reviewed.

7    *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state

8    court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

9    decision, as AEDPA directs us to do." *Id.* at 1196.

10             When . . . there is no reasoned state-court decision on the merits, the
              federal court "must determine what arguments or theories . . . could
11             have supported the state court's decision; and then it must ask
              whether it is possible fairminded jurists could disagree that those
12             arguments or theories are inconsistent with the holding in a prior
              decision of this Court."   *Richter*, 562 U.S. at 102.   If such
13             disagreement is possible, then the petitioner's claim must be denied.
              *Ibid*.

14   *Sexton*, 138 S. Ct. at 2558.

15

16                                    **III.  ANALYSIS**

17        For purposes of reviewing each of Petitioner's claims, the undersigned considers the last

18   reasoned decision on Petitioner's claims—that of the California Court of Appeal and California

19   Supreme Court when appropriate.

20             **A.    Ground One: the California Court of Appeal violated
              Petitioner's Fourteenth Amendment Due Process Rights to an
21             "adequate and effective" appeal and his Sixth Amendment right
              to jury "fact-finding" due to material factual and legal error in
22             affirming the trial court judgement**

23        **1. Background**

24        Petitioner contends the California Court of Appeal violated Petitioner's Fourteenth

25   Amendment due process right to an "ad equate and effective" appeal and his Sixth Amendment

26   right to jury fact-finding because it relied "on material factual and legal errors to affirm the trial

27   court's judgment and sentence."  (Doc. No. 1 at 34-42, quoting *Evitts v. Lucey*, 469 U.S. 382, 392

28   (1985) and citing to *Dillon v. United States*, 560 U.S. 817, 828 (2010)).  In support, Petitioner

                                           21

1    identifies a variety of errors he alleges the appellate court made, many of which are the same

2    errors identified in Grounds Two and Three below.  More particularly, Petitioner finds fault with

3    the Court of Appeal opinion on the basis that it contained "factual mischaracterizations and

4    omissions," interpreted facts in a manner that is "contradicted by the record," "relied on its own

5    appellate fact-finding and credibility determinations," "applied the wrong standard of error

6    review," "applied the wrong standard of harmlessness," and "failed to consider the trial record as

7    a whole."  (Doc. No. 1 at 35-40).

8         Respondent submits, to the extent Petitioner challenges the adequacy of appellate court's

9    process, the process was adequate, and this Court is bound by the court of appeal's decision.

10   (Doc. No. 13 at 22).  Further, Respondent argues federal habeas relief is unavailable to redress

11   independent claims of alleged procedural error in the state post-conviction review process.  (*Id.*)

12   (citing *Cooper v. Neven*, 641 F.3d 322, 331-32 (9th Cir. 2011); *Franzen v. Brinkman*, 877 F.2d

13   26, 26 (9th Cir. 1989).  Finally, Respondent argues the record and the state court's analysis show

14   "it is extremely unlikely that the result of Petitioner's appeal would have been any different."  (*Id.*

15   at 23) (*Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

16        **2. State Court Decision**

17        Petitioner raised this ground in his petition for review filed in the California Supreme

18   Court.  (*See generally* Doc. No. 14-59).  The California Supreme Court summarily denied the

19   petition for review.  (*See People v. Jones*, Case No. S242855 (Cal. 2017)).[4]

20        **3. Analysis**

21        Ground One presents somewhat of a hybrid situation.  Petitioner first raised this ground

22   before the California Supreme Court, but certain underlying components of this ground were

23   argued before and rejected by the California Court of Appeal.  The California Supreme Court

24   summarily denied Petitioner's petition for review.  The California Court of Appeal, as discussed

25   below in Grounds Two and Three, issued a lengthy reasoned opinion rejecting both grounds.

26

27   [4] It appears Respondent inadvertently attached as an exhibit a docket sheet from the California Supreme
     Court reflecting a different petitioner by the last name Johnson instead of the docket sheet related to
28   Petitioner's case.  (*See* Doc. No. 14-60).

1    Before turning to the merits, the undersigned first considers whether Ground One states a claim

2    cognizable for federal habeas corpus review.

3        Petitioner insists he is not raising claims of state law error but certain of the purported

4    errors identified by Petitioner are errors of state law.  (Doc. No. 18 at 13).  Errors of state law

5    cannot form the basis for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

6    To the extent that Petitioner challenges the California Appellate Court's factual findings in

7    Ground Two and Three as not supported by the record, the undersigned will address the proposed

8    factual discrepancies Petitioner raises when addressing the specific grounds below.

9        Similarly, challenges to the *adequacy* as opposed to the *availability* of a state post-

10   conviction are not redressable through federal habeas corpus proceedings.  *Franzen*, 877 F.2d at

11   26.  In *Franzen*, the petitioner alleged a due process violation because the appellate court took

12   more than a year to decide his petition for post-conviction relief.  The district court dismissed the

13   § 2254 petition as improper because an error in the post-conviction proceedings does not

14   represent an attack on Petitioner's detention.  (*Id.*at 26).  In affirming, the Ninth Circuit agreed

15   with every other circuit court addressing this issue, except the First Circuit, and held an attack on

16   the appellate court improper for § 2254 review.  (*Id.*); *see also Silversky v. Frink*, 500 F. App'x

17   625, 626 (9th Cir. 2012) ("A federal habeas petition is not the proper vehicle for addressing the

18   adequacy of process provided . . . in state post-conviction proceedings.").

19       While habeas relief may be available where a petitioner has been wrongfully denied his

20   right to appeal though the established state review process, Petitioner makes no such claim here.

21   Instead, Petitioner finds fault with the sufficiency of the process.  But the Constitution does not

22   mandate a post-conviction process.  *See Lackawanna Cty. Dist. Attorney v. Coss*, 532 U.S. 394,

23   402 (2001) ("[E]ach State has created mechanisms for both direct appeal and state postconviction

24   review, even though there is no constitutional mandate that they do so."); *Bell-Bey v. Roper*, 499

25   F.3d 752, 756 (8th Cir. 2007) ("Because the Constitution does not guarantee the existence of state

26   post-conviction proceedings, an infirmity in a state post-conviction proceeding does not raise a

27   constitutional issue cognizable in a federal habeas application.") (internal quotations and citations

28   omitted); *Dews v. Kern Valley State Prison*, No. 1:12-CV-00450-AWI, 2012 WL 2358643, at *5

23

1  (E.D. Cal. June 20, 2012) ("Although the Constitution does not require states to grant appeals as of

2  right to criminal defendants seeking to review alleged trial court errors, if under state law criminal

3  defendants have a right to appeal criminal convictions, the procedures used in deciding those appeals

4  must comply with the requirements of the Due Process and Equal Protection Clauses of the

5  Constitution.")

6      Petitioner's reliance on *Evitts v. Lucey* and *Dillon v. United States* in support of this

7  ground are misplaced.  In *Evitts* the Supreme Court concluded that the protection of the due

8  process clause guarantees an accused a right to effective assistance of counsel on a first appeal as

9  of right.  Petitioner does not contend that he was denied effective assistance of counsel on direct

10  appeal.  In *Dillon*, the Supreme Court determined that the trial court's findings of facts for

11  purposes of imposing a sentence of imprisonment under the guidelines range does not implicate a

12  defendant's Sixth Amendment rights.  *Dillon* has not bearings on factual findings by an appellate

13  court.

14      Petitioner identifies no established Federal law that the California Court of Appeal

15  violated.  Where there is no clearly established federal law on an issue, a state court cannot be

16  said to have unreasonably applied the law as to that issue.  *Carey v. Musladin*, 549 U.S. 70, 77

17  (2006).  Under AEDPA's strict standards, the Court is without power to issue a writ on Ground

18  One.

19          **B.  Ground Two:  Petitioner's was denied due process because
                the trial court erroneously admitted evidence of uncharged
20              McDonald's incidents despite petitioner's unfairly suggestive
                and unreliable information.**
21

22      **1. Background**

23      Ground Two challenges the in-court testimony of three witnesses to incidents that

24  occurred at a local McDonald's approximately a month before the victim's murder.  The

25  "McDonald's witnesses" refers to three women, Bentz, Griffin, and Cardenas, who testified they

26  personally witnessed incidents involving Petitioner and the victim ("Natalynn") while Petitioner,

27  Natalynn, and her mother ("Lee") ate at McDonald's.  (*See* Doc. Nos. 1 at 44-46; 13 at 23) (*see*

28  *also* Doc. No. 14-34 at 96-115 (Cardenas's testimony), 14-34 at 171-181; 14-35 at 6-30 (Bentz's

24

1    testimony), 14-35 at 66-93 (Griffin's testimony).   Cardenas and Griffin were both McDonald's

2    employees at the time of the events and had worked the same morning to mid-afternoon shift.

3    Bentz was a customer who was eating at the McDonald's with her grandchildren.  Bentz

4    (customer) and Griffin (employee) contacted law enforcement after learning of the Natalynn's

5    death.  They claimed they recognized Petitioner as the man who was mean to a little girl in

6    McDonald's after seeing his photograph on television.  (Doc. No. 1 at 44).  A year later, when

7    law enforcement learned that Cardenas was working with Griffin at the time of the reported

8    incident, Detective Arnold interviewed Cardenas.  Cardenas had not seen the incident reported on

9    television and had not seen Petitioner's photo on television.

10         Petitioner argues the trial court deprived him of due process of law by erroneously

11    admitting evidence of "uncharged McDonalds' incidents" despite Petitioner's "unfairly

12    suggestive and unreliable identification."  (Doc. Nos. 1 at 42-43; 18 at 23-33).  Citing to *Neil v.*

13    *Biggers*,[5] Petitioner argues law enforcement: (1) improperly did not ask the McDonald's

14    witnesses to describe Petitioner, the victim, and her mother; (2) presented the witnesses with

15    single photographs of Petitioner, the victim, and the victim's mother, instead of the standard

16    photograph array; and (3) were not given the standard admonishment.  (Doc. No. 1 at 45).

17    Petitioner similarly faults Detective Arnold for using the same deficient identification process

18    with Cardenas.  (*Id.* at 46).  Petitioner notes the trial court held an identification hearing and

19    found the identification process "inappropriate," but permitted the evidence to be introduced at

20    trial.  (*Id.* at 47).  And Petitioner points out the jury received "no limiting instruction" on the

21    "uncharged McDonald's incidents" and the prosecutor referenced it in closing argument.   (*Id.* at

22    47).

23         Respondent refers to Court to the California Court of Appeal opinion denying Petitioner

24    relief on this ground.  (Doc. No. 13 at 23-26).  Respondent argues it was undisputed that Natalynn

25    died while in Petitioner's custody, so, as stated by the appellate, "this was not a 'who done it'

26    type of case."  (*Id.* at 28).  Respondent contends the state appellate court correctly applied United

27

28    _____

[5] *Neil v. Biggers*, 409 U.S. 188 (1972).

1  States Supreme Court precedent in finding the identification procedure was not impermissibly

2  suggestive.  (*Id.* at 27).  In the alternative, even if the process was impermissibly suggestive,

3  Respondent notes the state appellate court in analyzing the claim determined the identifications

4  were reliable under the totality of the circumstances.  (*Id.*).  So, in the event there was error, the

5  appellate court determined any error was harmless. (*Id.*).  Key factors noted in the state appellate

6  court's order included: the witnesses were not identifying a single suspect to a crime occurring in

7  a dark alley, but instead in a well-lit McDonald's restaurant; all witnesses got a "good look" at

8  Petitioner; Bentz and Cardenas were sure of their identification of Petitioner and Natalynn;

9  Griffin was positive of her identification of Petitioner, Natalynn, and the victim's mother; and all

10  three McDonald's witnesses identified Petitioner in court.  (*Id.* at 27) (citing Exhibit A at 12-13).

11  **2. State Appellate Decision**

12  In denying Petitioner relief on this ground, the California Court of Appeals found:

> When challenging a lineup as suggestive or tainted, the defendant
> bears the burden of showing unfairness as a demonstrably reality,
> not just by speculation.  (*People v. DeSantis* (1992) 2 Cal. 4th 1198,
> 1221-1222; *People v. Ocha* (1998) 19 Cal. 4th 353. 412.)  The
> question of constitutional reliability depends on (1) whether the
> identification procedure was unduly suggestive and unnecessary
> and, if so, (2) whether the identification itself was nevertheless
> reliably under the totality of the circumstances.  In making the
> second determination, courts evaluate factors such as the
> opportunity of the witness to view the criminal at the time of the
> crime, the witness's degree of attention, the accuracy of his or her
> prior description of the criminal, the level of certainty demonstrated
> at the confrontation, and the time between the crime and the
> confrontation.  "'If, an only if, the answer to the first questions is
> yes and the answer to the second questions is no, is the
> identification constitutionally unreliable.'" (*People v. DeSantis,
> supra*, at p. 1222; *People v. Thomas* (2012) 54 Cal.4th 908, 930-
> 931.)
>
> A due process violation occurs only if the identification procedure
> is so impermissibly suggestive as to give rise to a very substantial
> likelihood of irreparable misidentification.  (*Simmons v. United
> States* (1968) 390 U.S. 377, 384; *People v. Cook* (2007) 40 Cal.4th
> 1334, 1355.)  A single person showup is not inherently unfair.  A
> procedure is unfair that suggests the identity of the person
> suspected by the police in advance of the witness's identification.
> (*People v. Ochoa, supra*, 19 Cal.4th at p. 413.)
>
> Although a single-suspect identification procedure generally is not
> the ideal or preferred method and can pose a danger of
> suggestiveness, it is not necessarily unfair.  (*People v. Clark* (1992)

3 Cal.4th 41, 136, abrogation on other grounds recognized in *People v. Pearson* (2013) 56 Cal.4th 393, 462; *see People v. Medina* (1995) 11 Cal.4th 694, 753.)  Having a witness view a single photograph of the defendant is not more impermissibly suggestive than an in-court identification of the defendant sitting at the defense table in the courtroom.  (*People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009.)  Other than the use of single photographs for each subject, there is nothing else in the record to suggest Arnold encouraged Cardenas or Bentz to identify defendant.  (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 39.)  On the other hand, the single-photograph procedure has been criticized.  (*See People v. Contreras* (1993) 17 Cal.App.4th 813, 820.)  Assuming arguendo the procedure used here was unduly suggestive, we review the identification process under the totality of the circumstances to determine if it was unfair.

Cardenas was contacted by Arnold about a year after Natalynn died.  Cardenas, however, paid close enough attention to the incident and had reported it to her supervisor.  This incident was noteworthy because defendant told a very young child to "shut the fuck up" four different times and left Natalynn crying at the table.  Cardenas also cleaned the table next to defendant, Lee, and Natalynn and got a good look at all three of them before they left the restaurant.  Cardenas was certain of her identification at the time she made it to Arnold and at defendant's trial.  Although Cardenas was reluctant to identify Lee at defendant's trial, she explained this was because she apparently did not want to look at Lee in the gallery.  Cardenas was confident of her identification of defendant and Natalynn.

Griffin was able to identify defendant and Natalynn.  Griffin made a positive identification of defendant in court.  Arnold showed Griffin photographs.  Griffin identified Natalynn from the girl in the photograph Arnold showed her and identified defendant in court as the man she saw with Natalynn at McDonald's.  She got a good look at defendant in the restaurant.  Griffin was able to identify Lee from surveillance video of her at McDonald's, not from seeing her on television or from the photograph Arnold showed her.  Griffin remembered what the trio ordered and how defendant had yelled at Natalynn about the Happy Meal toy.

Bentz apparently had a clearer view of defendant and Natalynn than she did of Lee.  Bentz reported the incident to Arnold less than two months after it happened and less than two weeks after Natalynn died.  Bentz only saw Lee from behind while she sat but could see her profile as Lee left the restaurant.  It is reasonable to infer Bentz also saw Lee's body at the same time.  Because Bentz did not see the front of Lee's face during the McDonald's incident, she forthrightly told Arnold and testified at trial that Lee looked like the woman in the restaurant the day of the incident.

The unique circumstances of defendant's behavior—yelling at and nearly hitting a small child only three and a half years old—made both encounters uniquely memorable and noteworthy.  The witnesses were not identifying a single suspect to a crime occurring in a dark alley.  Defendant's conduct occurred inside a restaurant

27

1

with presumably good lighting.  The witnesses were identifying a mother, her daughter, and the mother's boyfriend, who were dining together.  Bentz and Cardenas were sure of their identifications of defendant and Natalynn.  Griffin was positive of her identification of defendant, Lee, and Natalynn.  Also, Griffin was able to identify Lee from video recordings even though the defense investigator and Arnold could not definitely find any of the trio in video recordings. All three witnesses positively identified defendant in court.  Such identifications need not be excluded, even where the witness previously failed to identify a suspect.  (*People v. Dominick* (1986) 182 Cal.App.3d 1174, 1196-1197; *see People v. Contreras*, *supra*, 17 Cal.App.4th at p. 822.)

2

3

4

5

6

7

8

It is far less probable three independent witnesses to two separate events would misidentify defendant under circumstances where the same three people were at the same restaurant in Tulare, a small community.  As noted above, Arnold did not directly encourage Cardenas, Griffin, or Bentz to positively identify defendant, Lee, or Natalynn. Furthermore, the circumstances of the photographic identification procedure were disclosed to the jury, the witnesses were subjected to thorough cross-examination, and the jury was allowed to evaluate the reliability of the witnesses' identifications. (*People v. Alexander* (2010) 49 Cal.4th 846, 903.)  Evidence with some element of untrustworthiness is customary grist for the jury mill; jurors are not so gullible they cannot intelligently measure the weight of identification testimony with some questionable feature. (*Ibid*.)  Under the totality of the circumstances, we find the identifications of defendant by Bentz, Griffin, and Cardenas were reliable.  We also find the identifications of Lee and Natalynn reliable under the totality of the circumstances.

9

10

11

12

13

14

15

16

17

*People v. Jones*, No. F068996, 2017 WL 2131425, at *14-15; (*see also* Doc. Nos. 13-1 at 25-30;

18

14-57 at 25-30; 14-59 at 89-92).  In the alternative, the state court found, even if the procedures

19

were unduly suggestive, any error was harmless.  (Doc. No. 14-59 at 92) (citing to *Chapman v.*

20

*California*, 386 U.S. 18, 24-25 (1967)).

21

### 3. Analysis

22

Viewing the record as a whole, the state court's decision Ground Two was not based on an

23

unreasonable determination of the facts in light of the evidence presented for the reasons

24

discussed *infra*.

25

**Suggestive Identification Procedures**

26

An eyewitness identification may constitute a due process violation if the identification

27

procedures were "unnecessarily suggestive and conducive to irreparable mistaken identification."

28

*See Stovall v. Denno*, 388 U.S. 293, 302 (1967); *Manson v. Brathwaite*, 432 U.S. 98, 104, (1977);

28

1    *Neil v. Biggers*, 409 U.S. 188, 196 (1972); *Perry v. New Hampshire*, 565 U.S. 228 (2012).  The

2    fact that an identification procedure used was suggestive, alone, does not violate due process.  *See*

3    *Biggers*, 409 U.S. at 198-99.  Rather, the "central question" is "whether under the 'totality of the

4    circumstances' the identification was reliable even though the confrontation procedure was

5    suggestive." *Id*. at 199.  Coined "the *Biggers* factors," the Supreme Court instructs the court to

6    consider the following, *inter alia*, in evaluating "the likelihood of misidentification": (1) the

7    opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree

8    of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of

9    certainty demonstrated by the witness at the confrontation; and (5) the length of time between the

10    crime and the confrontation.  *Id*. at 199-200; *see also Sexton v. Beaudreaux*, 585 U.S. (2018).

11         Petitioner challenges as unduly suggestive the fact that Detective Arnold showed the

12    McDonald's witnesses single photographs of Petitioner, Natalynn, and her mother.  Noteworthy is

13    that each McDonald's witness identified Petitioner in open court during their testimony as the

14    person they observed with Natalynn in McDonald's.  Petitioner does not challenge the in-court

15    identifications, nor can he, considering defense counsel requested the prosecutor to have a witness

16    identify the Petitioner in court, as opposed to introducing the photographs, at least during

17    Cardenas's direct examination.  (*See e.g.* Doc. No. 14-34 at 106-107).  Two of the three

18    McDonald's witnesses had initiated contact with law enforcement after seeing the report of

19    Natalynn's death and Petitioner's arrest on television because they recognized Petitioner from the

20    photograph on television and associated him with an incident, which they had witnessed

21    involving the victim and Petitioner at McDonald's.  Identification of who was with Natalynn at

22    the time of her death was not at issue.  Nor did this case involve an in-person line-up at a police

23    station or identification by witnesses necessary to find probable cause to arrest a defendant.  Here,

24    the central question asked of the jury was *what* caused Natalynn's death.  Did Natalynn die from

25    choking on pizza, hitting her head on a dresser, or did Petitioner beat her?  As noted by the

26    California Court of Appeal, the witnesses were not identifying a single suspect to a crime

27    occurring in a dark alley.  Rather, as noted by the California Court of Appeal, the incidents at the

28    McDonald's were introduced to refute that Natalynn died "from asphyxiation and were relevant

1    only to uncharged acts showing intent or lack of accident. (*See* Evid. Code, § 1101.).”  (Doc. No.

2    14-59 at 94)

3          The state court’s decision denying Petitioner relief on his suggestive identification claim

4    was not contrary to the applicable federal law set forth by the United States Supreme Court.  The

5    appellate court correctly identified and applied the applicable *Biggers* factors, noting the

6    restaurant was well-lit; each witness testified that they got a “good look” at Petitioner and were

7    certain; and the incident itself was memorable because of the way the Petitioner treated the little

8    girl.  Arguably, certain *Biggers* factors are not applicable here to the extent *Biggers* also considers

9    the witnesses ability to view *the criminal at the time the crime occurred* and the length of time

10   *between the crime* and the confrontation, as it was undisputed that Petitioner was alone with

11   Natalynn when she died.

12         Second, the California Court of Appeal’s decision was not based on an unreasonable

13   determination of the facts based on the evidence presented.  Petitioner faults the appellate court

14   for stating that only “one” witness identified Petitioner and the victim from news stories when in

15   fact two of the McDonalds’ witnesses came forward after seeing the news stories.  (Doc. No. 1 at

16   35).  While Petitioner appears to be correct in noting the factual discrepancy in the appellate court

17   order, whether it was one or two witnesses who saw the news stories is irrelevant for the reasons

18   set forth in detail above. Primarily, this was not a “who done it case,” and the witnesses’ degree

19   of attention and circumstances surrounding their testimony about what they observed in

20   McDonalds between Petitioner, Natalynn, and Natalynn’s mother outweigh any concern over

21   whether it was one McDonalds witness or two who came forward to talk to law enforcement after

22   seeing news stories.

23         Each McDonald’s witness had an independent recollection of the incidents that occurred

24   in McDonald’s.  (*See generally* Doc. No. 14-34 at 96-115 (Cardenas’s testimony), 14-34 at 171-

25   181; 14-35 at 6-30 (Bentz’s testimony), 14-35 at 66-93 (Griffin’s testimony).  After Cardenas

26   initially observed the incident, she went closer to the booth where Petitioner and Natalynn were

27   eating to clean another booth.  (Doc. No. 14-34 at 103-105).  All witnesses testified that they got

28   a “good look” at Petitioner.  (Doc. No. 14-34 at 101-109; Doc. No. 14-35 at 8, 16 (Bentz was

1   "face to face" and looked in Petitioner's eyes); Doc. No. 14-35 at 78 (Griffin got "a good look" at

2   Petitioner and was close enough to hear him tell the little girl to "sit down" and "these damn

3   women just don't listen to him").  As correctly noted by the appellate court, Griffin even

4   remembered the trio's order, down to Natalynn having a cheeseburger happy meal.  (Doc. No. 14-

5   35 at 73).  Because the incidents were memorable to the McDonald's employees, they both

6   reported the incident they witnessed involving Petitioner to their manager.  (Doc. Nos. 14-34 at

7   105; 14-35 at 75).  As properly noted by the appellate court, all three witnesses were subject to a

8   vigorous cross-examination by defense counsel.  The trial transcript shows defense counsel

9   questioned the witnesses' ability to see, or whether they wore glasses, challenged their memory,

10   and extensively asked about their interview with law enforcement and the photographs law

11   enforcement showed them.

12        Petitioner points to other specific "factual errors" the appellate court made in reaching its

13   conclusion.  (Doc. No. 1 at 35-38, 40-41). These factual errors formed the basis of Petitioner's

14   objections to the initial findings and recommendations.  (*See* Doc. No. 21 at 4).  The undersigned

15   turns to address the remaining discrepancies Petitioner notes.

16        Petitioner faults the appellate court, noting that one of the witnesses, presumably Griffin,

17   recognized Natalynn and Petitioner from video images taken by the restaurant when that

18   reference is not supported by the record because Detective Arnold testified, he was never able to

19   locate the trio on the video.  (*Id.* at 35).  Petitioner correctly notes that witness Griffin did testify

20   to identifying Natalynn's mother "'from cameras at the store,'" when that could not have been

21   true because Detective Arnold later testified, he did not have a chance to review the surveillance

22   videos until the day after he met with Griffin.  (*Id.* at 36).  The appellate court's reference to the

23   video testimony mirrors Petitioner's argument here.  The appellate court noted the discrepancy

24   between Griffin's testimony and Detective Arnold's in its opinion.[6]

25        Petitioner further faults the appellate court for stating Detective Arnold "did not" name

26

27   ───────────────

[6] Specifically, the appellate court noted, "[a]lso, Griffin was able to identify Lee from video recordings
*even though the defense investigator and Arnold could not definitely find any of the trio in video*
28   *recordings*.  All three witnesses positively identified defendant in court." (*Supra* at 28) (emphasis added).

1   Natalynn's mother (Lee), Petitioner, or Natalynn when he showed individual photographs of them

2   when Arnold in fact testified, he showed the McDonalds witnesses single photographs and named

3   the subjects.  (Doc. No. 1 at 36).  And Petitioner contends the appellate court referenced Bentz's

4   testimony to a six-array photographic lineup when the prosecutor agreed as a matter of historical

5   fact, she had not seen a photographic array and instead later testified, or clarified, Detective

6   Arnold only showed her one photograph of Petitioner. (*Id.* at 36-37).    Again, this was not a "who

7   done it" case.  Whether the McDonalds witnesses were presented with one photograph or a

8   photograph array, discrepancies in the witnesses' testimony during trial occurs, and are matters of

9   credibility that the jury heard, weighed, and considered before rendering a guilty verdict.

10       Petitioner next faults the appellate court opinion for what he coins "material omissions."

11   (*Id.* at 37).  Petitioner points to discrepancies or testimony perceived favorable to the Petitioner

12   that the appellate court did not include in its opinion, including: (1) Detective Arnold did not give

13   any of the eyewitnesses a *Simmons* admonition (that the person in the photograph might not be in

14   the person originally seen), as he normally would do in a comparative array; (2) that Petitioner's

15   employer-documented hours and his own testimony he did not meet Natalynn and her mother for

16   lunch during work provided was proof he could not have been the person in McDonalds identified

17   by the McDonalds' witnesses; (3) during work days, he wore shirt with his company's name and

18   logo but the man identified in McDonalds did not have a work shirt on; (4) Bentz testified the

19   angry man in McDonalds raised his left fit when Petitioner is right-handed; and (5)  Bentz

20   testified Natalynn was in a highchair when both Petitioner and his mother testified Natalynn sat in

21   seats or booster chairs at restaurants.  The appellate court is not required to recite all evidence

22   presented in its opinion.  Even in instances where sufficiency of the evidence is challenged, which

23   was not done here, the courts look to whether any rational trier of fact could have found the

24   essential elements beyond a reasonable doubt.  Again, the jury heard all testimony and resolved

25   any and all discrepancies and credibility of the witnesses finding Petitioner guilty on the lesser-

26   charged offense.

27       Moreover, even if the identification was unduly suggestive, any error was harmless

28   beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18, 24 (1967).  The appellate

1    court's order noted any error was harmless and cited *Chapman*, the correct case on point.  The

2    case against Petitioner was strong.  Petitioner was alone with Natalynn when she died, the

3    consensus of the medical experts was she was dead when police and paramedics arrived, there

4    was other evidence that Petitioner had abused Natalynn in the past and had demonstrated animus

5    toward her.  Thus, the testimony of the McDonald's witness was cumulative of the other

6    overwhelming evidence supporting Petitioner's guilt.

7          **Limiting Instruction**

8          Petitioner points out the jury received "no limiting instruction" on the "uncharged

9    McDonald's incidents" and the prosecutor referenced it in closing argument.  (Doc. No. 1 at 47).

10   Petitioner does not challenge the failure to give a limiting instruction as a ground in his Petition

11   but refers to it in the factual narrative relating to the McDonalds' identification issue.

12         In the abundance of caution, the Court's independent review of the record shows the jury

13   was advised about eyewitness testimony and the *Biggers* factors, among other considerations.

14   (*See* Doc. No. 14-41 at 14-16).  The trial court also provided the jury instruction regarding

15   presumption of innocence and reasonable doubt, judging credibility and believability of the

16   witnesses using their own common sense and experience, among many other factors.  (*Id.* at 5-6,

17   10-12).

18         To the extent Petitioner refers to this eyewitness testimony as "uncharged McDonald's

19   incidents," (Doc. No. 1 at 47), such was not properly raised below to be considered exhausted,

20   nor was it briefed in the Petition.  (*See generally id.*).  Consequently, the undersigned does not

21   view this claim as a separate claim briefed for review in the Petition.  Further, it does not appear

22   Petitioner properly raised a limiting instruction claim to the State courts to be considered

23   exhausted.  (*See* Doc. No. 13-1 at 1-40) (not addressing a limiting instruction claim).  While

24   unclear, it appears Petitioner challenges the jury instructions to the extent the jurors were not

25   provided a limiting instruction on the McDonalds incidents.  As noted above, the jurors were

26   instructed on reasonable doubt and presumption of innocence.  Further, the jurors were instructed

27   on evidence that was admitted for a limited purpose, *see* Doc. No. 14-41 at 14, and advised about

28   statements witnesses made before trial.  (*Id.* at 15).  Moreover, an allegation that a jury instruction

33

1  is incorrect under state law does not form a basis for federal habeas corpus relief.  *Estelle v.*

2  *McGuire,* 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief

3  does not lie for errors of state law.").  In reviewing an ambiguous instruction, the inquiry is

4  "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

5  way' that violates the Constitution." *Id.* at 72 (quoting *Boyde v. California,* 494 U.S. 370, 380

6  (1990).  A jury instruction violates the Constitution if its use "so infused the trial with unfairness

7  as to deny due process of law." *Lisenba v. California,* 314 U.S. 219, 228 (1941).  The instruction

8  "must be considered in the context of the instructions as a whole and the trial record." *Estelle,*

9  502 U.S. at 67 (*citing Cupp v. Naughton,* 414 U.S. 141, 147 (1973).  In the event constitutional

10  error occurred, the court must apply the harmless error analysis mandated by *Brecht v.*

11  *Abrahamson,* 507 U.S. 619 (1993).  In *Brecht,* the Supreme Court held that habeas relief based on

12  trial error may only be granted when that error "'had substantial and injurious effect or influence

13  in determining the jury's verdict.'" 507 U.S. at 637) (*quoting Kotteakos v. United States,*328 U.S.

14  750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).  Here, considering the jury returned a conviction

15  on a lesser offense than charged, the McDonalds' witnesses' testimony did not have a substantial

16  and injurious effect, nor influence the jury's verdict.

17      Upon a thorough review of the record and applicable law, the undersigned finds the state

18  court's adjudication of the claim was not contrary to clearly established federal law, did not

19  involve an unreasonable application of the clearly established law, and was not based on an

20  unreasonable determination of the facts in light of the evidence presented in the state court

21  proceedings.  Accordingly, the undersigned recommends Ground Two be denied.

### C.  Ground Three: the prosecutor in her initial closing argument made repeated, improper "Golden Rule" appeal to juror emotions over defense objections and the prosecutor's misconduct was magnified by trial court error which resulted in a fundamentally unfair trial and denied Petitioner due proceed under the Fourteenth amendment

### 1. Background

27      Petitioner argues the prosecutor's argument in closing improperly appealed to juror

28  emotion, over defense objection, which was magnified by the trial court error in allowing it,

34

1  thereby violating his Fourteenth Amendment right to due process and a fair trial.  (Doc. No. 1 at

2  48).  Citing *Darden v. Wainwright*,[7] Petitioner refers to other emotional testimony during trial,

3  including the victim's biological father's testimony (Troy Miller), a photo of Natalynn taken days

4  before the death portraying a happy and safe time, references to Natalynn's dad in the final

5  portion of her closing argument with the theme "children are not supposed to predecease their

6  parents because that is not the natural order."  (*Id.* at 49-51).  The trial court sustained certain of

7  the defense's objections, cautioned the prosecutor to focus on the "evidence," but failed to

8  admonish the jury regarding the prosecutor's closing argument.

9        In response, Respondent cites to the California Court of Appeal decision addressing the

10  alleged prosecutorial misconduct and the defense's motion for a new trial based on the closing

11  argument.  (Doc. No. 13 at 28-33).  In summation, citing to *Brecht*,[8] Respondent contends the

12  appellate court's conclusion that the prosecutor's closing argument did not render Petitioner's

13  trial fundamentally unfair "was not contrary to or an unreasonable application of clearly

14  established federal law.  Nor was Petitioner prejudiced."  (*Id.* at 35).

15        **2. State Appellate Decision**

16        The California Court of Appeal denied Petitioner relief on this ground.  While the

17  appellate court conceded that some of the prosecutor's arguments were improper, it noted that the

18  objections to those arguments were sustained at trial and concluded that the other limited

19  comments did not deprive Petitioner of a fair trial:

20            A prosecutor who uses deceptive or reprehensible methods to
             persuade the jury commits misconduct.  Reversal under the federal
21            Constitution is necessary only when these methods infect the trial
             with such unfairness as to make the resulting conviction a denial of
22            due process.  (*People v. Salcido* (2008) 44 Cal.4th 93, 152, *citing
             Darden v. Wainwright* (1986) 477 U.S. 168, 181.)
23
             During the guilt phase of a trial, it is improper for a prosecutor to
24            appeal to sympathy for the victim.  The prosecutor's introduction of
             victim-impact testimony is impermissible in the guilt phase of a
25            capital trial.  (*People v. Salcido, supra*, 44 Cal.4th A p. 151.)  It is
             misconduct for a prosecutor to argue during the guilt phase of a
26            capital case, or a in a non-capital case, that the jury consider the

27  ───────────────

28  [7] *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).
   [8] *Brecht*, 507 U.S. at 637-38.

35

impact of a crime on the victim's family.  (*Vance, supra*, 188 Cal.App.4th at pp. 1193, 1199.) [a related California precedent].

. . . .

We agree with the defendant, and the People *concede*, the prosecutor's Golden Rule argument introduced improper victim impact evidence during the guilt phase of trial.  Unlike the comments by the prosecutor in *Vance*, however, the prosecutor's conduct was not egregious or prolonged.

(*See* Doc. No. 13-1 at 33-35) (emphasis added).

### Golden Rule Argument

We reject defendant's arguments. [footnote modified on rehearing incorporated in body of text]. To the extent the prosecutor's statements concerning fear Natalynn experienced constituted improper Golden Rule argument, defense counsel lodged no objection to these comments.  Defense counsel did lodge timely objections to the prosecutor's victim impact statements in closing argument. Although the failure to lodge a timely objection on the proper ground to alleged prosecutor misconduct constitutes a forfeiture of the issue on appeal (*see People v. Mendoza* (2007) 42 Cal.4th 686, 705), we do not resolve the Golden Rule argument on this basis and reach the merits of all of defendant's challenges to the prosecutor's closing argument. [end of footnote]. We note, in contrast to the prosecutor's comments in *Vance*, the prosecutor here did not continue with improper argument after the objections were sustained.

. . . .

(Doc. No. 14-48 at 1-2) (modified order)._

The aspect of the prosecutor's argument concerning Natalynn's fear of the defendant was fair commentary based on testimony from several witnesses.  Natalynn's fear of defendant was relevant to refute defendant's contentions that Natalynn died by accident and she preferred to be with him rather than her father.  The prosecutor's references to defendant's torture and murder of Natalynn were based on the People's theory of the case. The remainder of the prosecutor's lengthy closing argument, taken as a whole, focused on the evidence and the trial testimony supporting the prosecutor's theory of first degree murder with a torture special circumstance.  Prosecutors are given wide latitude in oral argument, which can be vigorous as long as it focuses on fair comment on the evidence.  A prosecutor is not limited to Chesterfieldian politeness and may use appropriate epithets. (*People v. Williams* (1997) 16 Cal.4th 153, 221.)

### Victim Impact Argument

The prosecutor briefly commented on how cute Natalynn looked in a photograph, but made the comment in context of what Miller lost and the future relationship between father and daughter that was

36

lost.  The prosecutor said this on the theme of Miller's loss of a future relationship with Natalynn and how Natalynn's death went against the natural order of life and death between generations. We note there were multiple victim impact comments, they were short in duration, they were limited to Miller, and they pointed out the clearly obvious reality that Miller lost a future relationship with Natalynn.  It is unlikely the prosecutor's comments concerning the impact of defendant's crime on Miller swayed the jury, especially where, as here, defense counsel responded effectively to the prosecutor's arguments during his own closing argument. (*See People v. Martinez, supra,* 47 Cal.4th at p. 957.)

### *Absence of Admonishment and Prejudice*

Although the trial court did not admonish the jury to disregard the prosecutor's comments at the time they were made, immediately before closing arguments, the jury received instructions on the duties of the jury focusing on how the jurors decide the facts and directing the jurors to not let bias, sympathy, or prejudice influence their opinion. [footnote omitted from body of text]. The jury received the reasonable doubt instruction set forth in CALCRIM No. 220, emphasizing defendant's presumed innocence and stating the jury "must impartially compare and consider all the evidence that was received throughout the entire trial."  The jury was further instructed with CALCRIM No. 222 on its duty to decide the facts, evidence, the sworn testimony of witnesses, and exhibits admitted into evidence.  This instruction admonishes the jury that the statements of the attorneys in opening and closing statements are not evidence and only the sworn testimony of witnesses and admitted exhibits are evidence.  This instruction also advised the jury not to consider matters upon which the court sustained an objection.

Jurors are presumed to understand and follow the trial court's instructions.  (*People v. Martinez, supra,* 47 Cal.4th at p. 957; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  These instructions effectively advised the jurors to focus on the evidence, avoid passion in their deliberations, and to consider evidence over the arguments of counsel.  Defense counsel further effectively challenged the prosecutor's argument, appealing in his own closing argument for the jury not to be moved by passion but to employ reason to the evidence presented at trial.  These instructions, coupled with the trial court sustaining defense counsel's objections to the prosecutor's victim impact comments, were sufficient to overcome any sympathy or prejudice evoked by the prosecutor.

As noted, the scope of the prosecutor's comments was [sic] far less extensive than the prosecutor's prolonged and far ranging comments in *Vance*.  All of the prosecutor's challenged closing argument occurred in five pages of reporter's transcript.  The prosecutor's closing statements were about 71 pages of reporter's transcript.  Defendant counsel's closing statements were approximately 120 pages of reporter's transcript.  The jury heard testimony from some 40 witnesses, including defendant.  Given the long duration of closing arguments by both parties, the limited

1

2

3

4

> scope of the challenged argument, and the volume of testimony, we find the challenged argument to be a small part of the argument to the jury and of the trial.  Unlike the prosecutor's closing argument in *Vance*, the prosecutor here never disparaged defense counsel, limiting her disagreements with defense counsel in the interpretation of how Natalynn died based on the evidence adduced at trial.

5

6

7

8

9

10

11

> . . . .
>
> It is not reasonably probable a result more favorable to defendant would have been reached absent the misconduct or with a curative instruction.  (*People v. Arias* (1996) 13 Cal.4th 92, 161 [jury failed to reach verdict after lengthy deliberations on enhancements ultimately dismissed].)  Given the strength of the People's case against defendant, there is no reasonable probability the prosecutor's brief and isolated comments could have influenced the jury's guilt determination.  (*People v. Martinez*, *supra*, 47 Cal.4th at p. 957; *People v. Medina* (1995) 11 Cal.4th 694, 759-760.)  The misconduct was not prejudicial given the very strong evidence of defendant's guilt.  (*People v. Martinez*, *supra*, at p. 957; *People v. Mendoza*, *supra*, 42 Cal.4th at p. 704.)  We find no prejudicial error under the state or federal Constitution.

12

13

14

*People v. Jones*, No. F068996, 2017 WL 2131425, at *17-20; modified on denial of reh'g (June 6, 2017); *see also* Doc. No. 13-1 at 30-39; Doc. No. 14-57 at 30-39; Doc. No. 14-58 at 1-2 (modifying opinion).

15

16

**3.  Analysis**

17

In *Darden v. Wainwright*,[9] the United States Supreme Court reviewed a trial court to

18

confirm fundamental fairness involving a closing argument that was notably "worthy of

19

condemnation it . . . received from every court to review it."  477 U.S. at 179.  In so doing, the

20

Supreme Court reiterated "[t]he relevant question is whether the prosecutor's comments 'so

21

infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

22

(*Id.* at 181) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  Significantly, the Supreme

23

Court further cautioned "the appropriate standard of review for such a claim on writ of habeas

24

corpus is 'the narrow one of due process, and not the broad exercise of supervisory power." (*Id.* at

25

642) (other citations omitted).

26

As mentioned *supra*, Petitioner points specifically to a portion of the prosecutor's closing

27

argument, including her reference to Natalynn's father, who had provided emotional testimony

28

---

[9] *Darden v. Wainwright*, 477 U.S. 168 (1986).

1  during the trial and "nature's way."  Specifically, the prosecutor remarked during closing

2  argument:

> When Natalynn died, a beautiful relationship between father and
> daughter was destroyed; in her father's place, Natalynn was forced
> to spend her last moments with [P]etitioner, the monster; and
> between Natalynn's terror, Miller's loss, and "nature's way"—a
> child isn't supposed to predecease her parents . . . .

6  (Doc. No. 1 at 51) (other citations omitted).

7        Petitioner makes much ado about the California Court of Appeal's unreasonable

8  determination of the facts in light of the evidence presented when it found the prosecutor stopped

9  making improper comments when the trial judge sustained the defense's objections.  Petitioner

10  contends that is an unreasonable determination of the facts because the record shows the

11  prosecutor continued her improper statements in her closing argument after the trial court

12  sustained defense counsel's objection.

13        While it arguably true that the prosecutor continued to make improper statements in

14  closing argument after directed to stop, here, Petitioner's argument is one without distinction

15  because the People *conceded* on appeal that the closing argument contained improper statements.

16  Despite the prosecutor's conceding improper statements during closing argument, the appellate

17  court reasonably applied United States Supreme Court precedent and determined the trial was

18  nevertheless fundamentally fair.   The appellate court correctly noted that the trial judge did not

19  immediately admonish the jurors to disregard the prosecutor's comments, but the jury instructions

20  directed jurors, among other things, not to consider matters the court sustained objections on, not

21  to let bias, sympathy, or prejudice influence their decision, and that opinions of lawyers did not

22  constitute evidence.  And immediately before the closing arguments commenced, the trial judge

23  instruction the jurors again that what the attorneys state is not evidence.  While Petitioner may

24  argue that the trial judge should have admonished jurors during the closing arguments, instead of

25  relying on the jury instructions, such admonitions during closing arguments are exceedingly rare.

26  As the United States Supreme Court has recognized in dicta "interruptions of arguments, either by

27  an opposing counsel or by the presiding judge, are matters to be approached cautiously." *United*

28  *States v. Young*, 40 U.S. 1, 13-14 (1985) (finding no plain error or violation of fundamental

1  fairness when prosecutor responded to defense's counsel's improper closing argument by

2  expressing personal opinion of defendant's guilt).

3      Upon a thorough review of the record and applicable law, the undersigned agrees and

4  finds the state court's adjudication Petitioner's prosecutorial misconduct claim was not contrary

5  to clearly established federal law, did not involve an unreasonable application of the clearly

6  established law, and was not based on an unreasonable determination of the facts in light of the

7  evidence presented in the state court proceedings.

8      The appellate court considered the whole record in finding Petitioner's right to due

9  process was not violated, including, but not limited to, the strength of the People's case against

10  the Defendant, that some forty witnesses testified, the breadth and depth of defense's closing

11  argument, the jury instructions advising jurors not to be persuaded by "bias, sympathy, prejudice

12  or public opinion," and that Petitioner was in fact convicted of the lesser-offense of second degree

13  murder.  The appellate court's determination of the facts was reasonable based on the evidence

14  presented at trial.  The appellate court examined the entire record to reach its conclusion.  And the

15  record confirms the appellate court's findings that the prosecutor's improper comments were but

16  a small piece of a very large puzzle that did not infect the trial with unfairness.   Moreover, the

17  prosecutor's arguments in rebuttal closing argument commented on the evidence presented and

18  contained only one objection from defense counsel.   (*See* Doc. No. 14-41 at 201-230).

19      The case boiled down to the jury deciding who presented the most credible explanation of

20  the cause of Natalynn's death.  Was her death accidental or did Petitioner beat her to death.  The

21  jury faced the monumental task of weighing evidence and credibility of forty people testifying in

22  court, over a three-week period, including but not limited to three medical experts for the

23  prosecution, defense's medical expert, defendant's mother, brother, and sister, and the

24  defendant.[10]

25      The jury heard and considered evidence for the defense.  Petitioner's mother and brother,

26  who was a police officer, testified that the victim was accident prone.  (*See e.g.* Doc. No. 14-35).

27

28  [10]The undersigned summarizes three weeks of trial testimony into a paragraph.

40

1   Petitioner's older sister testified that the Petitioner was "like the father" to her first child and

2   although the Petitioner played rough with his nephews (her sons), he treated Natalynn delicately.

3   (Doc. No. 14-37 at 192-193, 200).  Defense also called agriculture biologist and pest management

4   specialist, who suggested Natalynn have contracted the E-Coli bacteria from the clamshell (or

5   mussel shell) she put up her nose a week before her death.  (Doc. No. 19-37 at 166-179).  The

6   defense medical expert pointed out weaknesses he in Natalynn's autopsy, such as not taking a

7   proper blood sample (blood was taken from the heart (a central specimen) instead of a peripheral

8   blood) (*id.* at 215); not obtaining eye fluid to rule out "rapid onset diabetic ketoacidosis" (*id.* at

9   214, 216-); opining the burn mark on the victim was "definitely" not a cigarette burn mark but

10   was consistent with a shell being stuck up the nose (*id.* at 224); opining the bruises on the

11   victim's head were between one week and one day old but he could not opine if they happened at

12   the same time (*id.* at 240-242); and, suggesting the life saving measures, including CPR, could

13   have caused bruising (*id.* at 243).

14       Contrarily, the prosecution's physicians and medical experts testified the victim had been

15   beaten to death.  (*See e.g.* Doc. No. 14-36 at 96 (testifying that with "so many" lesions it takes it

16   out of the "accidental category.") (*Id.* at 99-100) ("With that many lesions she would have had to

17   fall down several flights of stairs or would have had to be a complex fall."); (*Id.* at

18   102)(considering the number of head injuries, could be possible if "she rolled down a cliff."); (*Id.*

19   at 104)(noting with all the bruises on different planes of her head, she was alive when they

20   happened); (*Id.* at 113)(discussing blunt force trauma to abdomen caused by a "severe blow to the

21   abdomen, punch or a kick or something."); (Doc. No. 14-37 at 8-31) (following review of all

22   records, including but not limited to, the autopsy and crime scene photos, corner's report, x-rays,

23   handwritten statements victim's injuries, pathologist states when paramedics arrived the victim

24   was already deceased, blunt force trauma was the cause of death, and it was not accidental).  A

25   neighbor, who lived in an apartment above the victim, corroborated the medical experts'

26   testimony attesting to hearing on the day of the murder "really loud thumping against the wall"

27   "at least six times" unlike anything he heard before.  (Doc. No. 14-34 at 137).  The neighbor

28   testified to hearing someone saying "come, baby, wake up, baby." (*Id.* at 138-139).

1    The jury deliberated and asked follow-up questions. Ultimately the jury returned a guilty

2  verdict and found Petitioner guilty of the lesser offense of second-degree murder.  It is not logical

3  to conclude that the jury would have found Petitioner not guilty on all counts but for the

4  prosecutor's closing argument considering the totality of the record.

5    Because the state appellate court's decision was not contrary to or involved an

6  unreasonable application of clearly established Federal law, nor resulted in a decision based on an

7  unreasonable determination of the facts in light of the evidence presented, Ground Three is

8  without merit and should be denied.

9            **D.  Ground Four:  the cumulative impact of the errors raised in**
              **grounds two and three denied Petitioner of due process and a**
10            **fundamentally unfair trial**

11      **1.  Background**

12    Petitioner raises an independent cumulative error ground asserting the "impact of the

13  errors" of Grounds Two and Three denied him due process and a fair trial.  (Doc. Nos. 1 at 51; 18

14  at 40-41).  Specifically, Petitioner argues that both the misidentification process coupled with the

15  prosecutorial error combined to make his trial fundamentally unfair.  (Doc. No. 18 at 41).

16    Respondent argues Ground Four is not cognizable for federal habeas corpus review

17  because there is no United States Supreme Court authority holding that "several errors of less

18  than constitutional magnitude can be cumulated into a due process violation," and Petitioner's

19  reliance on *Taylor v. Kentucky*[11] does not support his position.  (*Id.* at 35-36).  Respondent

20  contends that the Ninth Circuit Court of Appeals has further found when there is no single

21  constitutional error existing, nothing can accumulate to the level of a constitutional violation.  (*Id.*

22  at 36) (citing *Mancuso v. Oliverez*, 292 F.3d 939, 957 (9th Cir. 2002); *Williams v. Anderson*, 460

23  F.3d 789, 816 (6th Cir. 2006)).

24    In Reply, Petitioner recognizes that the Ninth Circuit's opinion in *Mancuso* is confusing

---

[11] In *Taylor v. Kentucky*, the United States Supreme Court found a trial court's failure to give the jury the requested reasonable doubt instruction amounted to fundamental error based on prosecutor's remarks during open and closing statements that could have caused the jury to possibly convict the defendant on extraneous considerations where the evidence boiled down to the credibility of the victim of the robbery or the defendant, who both testified.  436 U.S. 478-487, 490 (1978).  Here, as discussed *infra*, there is no error to accumulate.

1  as to whether a cumulative error claim exists in federal habeas corpus review but contends that

2  the Ninth Circuit has made clear that it interpreted the United States Supreme Court as

3  recognizing a cumulative error claim on habeas corpus review. (Doc. No. 18 at 40).  Respondent

4  further notes a circuit split on this issue. (*Id.* at 40-41) (citing *Littlejohn v. Trammell*, 704 F.3d

5  817, 869, n. 29 (10th Cir. 2013)).

6              **2.  State Court Decisions**

7          The California Court of Appeal denied Petitioner relief on this ground.  (Doc. No. 14-59

8  ay 104).  Briefly, the appellate court found:

9                Even considering the limited number of errors together, including

10                prosecutorial misconduct and the alleged suggestive photographic
identifications, we find the cumulative prejudice flowing form these

11                did not render defendant's trial fundamentally unfair.

12  (Doc. No. 14-59 at 104).  Petitioner raised his cumulative error claim before the California

13  Supreme Court citing to *Taylor v. Kentucky*.  (Doc. No. 14-59 at 62).  The California Supreme

14  Court denied Petitioner's petition for review.  *See People v. Jones*, Case No. S242855 (Cal.

15  2017).

16              **3. Analysis**

17          "Cumulative error applies where, although no single trial error examined in isolation is

18  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

19  prejudice[d] a defendant."  *Cook v. Kernan*, 801 F. App'x 474, 477 (9th Cir. 2020) (internal

20  quotations and citations omitted).  The cumulative error, however, "must render the trial and

21  sentencing fundamentally unfair."  *Id.* (citations omitted); *see also Parle v. Runnels*, 505 F.3d

22  922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302-03, 290 n. 3

23  (1973); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *but see Keith v. Mitchell*, 455 F.3d

24  662, 679 (6th Cir. 2002)(noting the Supreme Court has not held that constitutional claims that

25  would not  individually support habeas relief may be cumulated in order to support relief); *see*

26  *also*, *Lott v. Trammell*, 705 F.3d 1167, 1122-23 (10th Cir. 2013)(recognizing a split amongst the

27  circuit courts on whether a standalone cumulative error claim exists and "does not resolve the

28  question today.")(citations omitted); *Morris v. Sec'y Dep't of Corr.*, 677 F.3d 1117, 1132 n. 3

1  (11th Cir. 2012)(recognizing the circuit split on cumulative errors, declining to address whether

2  such a claim exists, and nevertheless denying relief on the cumulative error in the absence of any

3  individual errors to accumulate).

4       Notably, the Ninth Circuit has "granted habeas relief under the cumulative effects doctrine

5  when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each

6  other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001

7  (9th Cir. 2011) (citing *Parle*, 505 F.3d at 933).  For example, in *Parle*, "*all* of the improperly

8  excluded evidence . . . supported Parle's defense that he lacked the requisite state of mind for

9  first-degree murder; at the same time, all of the erroneously admitted evidence . . . undermined

10  Parle's defense and credibility and bolstered the State's case." *Parle*, 505 F.3d at 930.

11       Here, in contrast, the undersigned finds California Court of Appeal reasonably rejected

12  Petitioner's claims of suggestive identification and prosecutorial misconduct during closing

13  argument, so there is no error to accumulate.  Further, the state appeal court similarly rejected

14  cumulative error claim finding the cumulative prejudice did not render Petitioner's trial

15  fundamentally unfair.

16       Thus, absent a finding of error on Grounds Two and Three, the undersigned cannot find

17  cumulative error.  Furthermore, the undersigned concludes Petitioner cannot show his trial was

18  fundamentally unfair.  Because the state court's decision was not contrary to or involved an

19  unreasonable application of clearly established Federal law, nor resulted in a decision based on an

20  unreasonable determination of the facts in light of the evidence presented, Petitioner is not

21  entitled to habeas relief on Ground Four.

22                    **IV.  CERTIFICATE OF APPEALABILTY**

23       State prisoners in a habeas corpus action under § 2254 do not have an automatic right to

24  appeal a final order.  *See* 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36

25  (2003).  To appeal, a prisoner must obtain a certificate of appealability.  28 U.S.C. § 2253(c)(2);

26  *see also* R. Governing Section 2254 Cases 11 (requires a district court to issue or deny a

27  certificate of appealability when entering a final order adverse to a petitioner); Ninth Circuit Rule

28  22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

1    Where the court denies habeas relief on procedural grounds without reaching the merits of

2    the underlying constitutional claims, the court should issue a certificate of appealability only "if

3    jurists of reason would find it debatable whether the petition states a valid claim of the denial of a

4    constitutional right and that jurists of reason would find it debatable whether the district court was

5    correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a plain

6    procedural bar is present and the district court is correct to invoke it to dispose of the case, a

7    reasonable jurist could not conclude either that the district court erred in dismissing the petition or

8    that the petitioner should be allowed to proceed further." *Id.* Where a court denies habeas

9    claims on the merits, the petitioner is required to show that "jurists of reason could disagree with

10   the district court's resolution of his constitutional claims or that jurists could conclude the issues

11   presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.

12   Here, reasonable jurists would not find the undersigned's conclusion debatable or conclude that

13   Petitioner should proceed further. The undersigned therefore recommends that a certificate of

14   appealability not issue.

15        Accordingly, it is **RECOMMENDED**:

16        1.    The Petition for Writ of Habeas Corpus (Doc. No. 1) be denied.

17        2.    The certificate of appealability not issue.

18   ////

19   ////

20   ////

21   ////

22   ////

23                          **NOTICE TO PARTIES**

24        These findings and recommendations will be submitted to the United States district judge

25   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen (14)

26   days after being served with these findings and recommendations, a party may file written

27   objections with the Court. The document should be captioned "Objections to Magistrate Judge's

28   Findings and Recommendations." Parties are advised that failure to file objections within the

specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:    December 14, 2022

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE